[Cite as *In re Z.D.*, 2015-Ohio-5262.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102799**

## IN RE:   Z.D.; J.E.; J.E., JR.; and J.D.
## Minor Children

[Appeal by Mother]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD14902219; AD14902220; AD14902221; and AD14902222

**BEFORE:**   Laster Mays, J., Keough, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**   December 17, 2015

**ATTORNEYS FOR APPELLANT**

Christopher R. Lenahan
2035 Crocker Road, Suite 104
Westlake, Ohio 44145

R. Brian Moriarty
55 Public Square, 21st Floor
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**, **C.C.D.C.F.S.**

Timothy J. McGinty
Cuyahoga County Prosecutor

By:   Amy L. Carson
Assistant Prosecuting Attorney
3955 Euclid Avenue
Cleveland, Ohio 44115


**ATTORNEY FOR CHILDREN**

Paul A. Daher
Paul A. Daher & Associates
700 W. St. Clair Avenue, Suite 218
Cleveland, Ohio 44113


**ATTORNEY FOR J.E.**

Michael S. Weiss
602 Rockefeller Building
614 W. Superior Avenue
Cleveland, Ohio 44113

**GUARDIAN AD LITEM FOR CHILDREN**

Dean A. Colovas
4403 St. Clair Avenue
The Brownhoist Building
Cleveland, Ohio 44103


**GUARDIAN AD LITEM FOR N.D.**

Mark Witt
6209 Barton Road
North Olmsted, Ohio 44070


**ATTORNEY FOR L.K.**

Thomas Kozel
P.O. Box 534
North Olmsted, Ohio 44070

ANITA LASTER MAYS, J.:

**{¶1}** Appellant Mother appeals the juvenile court's decision granting permanent custody of her four children to the Cuyahoga County Division of Children and Family Services ("CCDCFS"). As required by App.R. 11.1(D), this court has expedited the hearing and disposition of this appeal. The juvenile court's order is affirmed.

## I. Procedural and Factual History

**{¶2}** Custody in this case involves four children whose ages are listed as of the date of the February 2015 permanent custody hearing. Z.D., is an eight-year-old male with multiple mental challenges; (2) J.E., Jr., is a seven-year-old male; (3) J.E. is a six-year-old female; and (4) J.D. is a five-year-old female.

### A. History prior to permanent custody hearing.

**{¶3}** In January 2014, CCDCFS filed a complaint alleging that the children were neglected, dependent, and required protective services. CCDCFS dismissed the complaint and filed a new one in February 2014, seeking permanent custody due to neglect and emergency temporary custody because the Mother was incarcerated and the children required care.

**{¶4}** Temporary custody was granted and an adjudication hearing was held October 2014. Mother, assisted by a guardian ad litem, admitted at the hearing that she was incarcerated for three years for attempted aggravated robbery and that she had failed to fully participate in services to address her anger management and mental health issues.

**{¶5}** Testimony at the hearing recounted the agency's history with the family. The Mother was involved with the agency as a child when she and her siblings were removed from the custody of her mother, B.D. In 2004, CCDCFS was involved with the removal of the Mother's older child who was permanently placed with a family member. The Mother was charged with child endangering in 2008 for leaving the children home alone, and the agency assumed temporary custody of the children in 2009 for the Mother's failure to attend to Z.D.'s mental needs as well as the inability to care for the children.

**{¶6}** The Mother completed a case plan that involved receiving treatment for mental disorders, dealing with the children's exposure to domestic violence and acquiring parenting skills and housing. Z.D. was returned to his Mother in February 2010 and received counseling. The other children joined them in October 2010.

**{¶7}** In February 2014, the Mother was incarcerated for attempted aggravated burglary. At that time, she was employed at a fast food restaurant. She left the children with her manager and his wife, who the children had only known for a few weeks. Z.D. had to be hospitalized for suicidal ideation and the manager and his wife informed the agency that they were overwhelmed. It was at this point that CCDCFS pursued emergency temporary custody. On February 25, 2015, the trial court found the children to be neglected.

**B.  Permanent custody hearing.**

**{¶8}**   At the time of the permanent custody hearing, the Mother was incarcerated, awaiting a judicial release hearing. It was established that, even if her release was granted, she would be transferred to a community based correctional facility and would not be available to care for the children.

**1.  Social worker Brown.**

**{¶9}**  Social worker Ms. Brown ("Brown") testified that she had worked with the family in 2009 and more recently from 2012 to the current hearing. Brown recited the family's rather extensive history with the agency and stated that, while the Mother had previously participated in case plan activities, she has failed to demonstrate an ability to apply what she learned.  Brown also said that the children lived a transient life style with their Mother, staying with different people and moving from house to house. The agency has received more than 20 calls since November 2012 expressing concerns about the children's care.

**{¶10}**  Several motions for custody had been filed by relatives for one or more of the children. The children expressed their desire to remain together wherever placed.

**{¶11}**  CCDCFS was unable to establish a father for the females, J.E. and J.D. The alleged father of J.D. was deceased and paternity had not been confirmed.  Brown testified that an alleged aunt, T.J., expressed an interest in having a DNA test.  A social worker began the home study process but no effort had been made by T.J. to have the test

and the fingerprint results were still pending. Paternity testing ruled out a man who came forward as the possible father of J.E. (female). No support had been provided.

{¶12} L.K., the father of Z.D., was also incarcerated. Z.D. had a limited relationship with his father who did not provide support, and was "in and out" of prison. L.K. mailed the address of his mother ("H.M.") to the agency to contact regarding custody of Z.D. Brown testified that she had not attempted to contact H.M. but believed that another social worker had. None of L.K.'s relatives visited the child or applied for custody.

{¶13} The father of J.E., Jr. ("J.E., Sr."), informed the agency that he was willing to participate in a case plan. He had visits with the children at the agency and they all called him "dad." J.E., Sr. had a domestic violence history with the Mother that had been observed by the children, including observation by Z.D. of an alleged attempt to run over the Mother with a car.

{¶14} Brown stated J.E., Sr. had recently found a job and expressed a willingness to participate in anger management and substance abuse, if required. He was involved in a few visits with J.E., Jr. at the agency where his siblings were also present and it was clear that all of the kids were familiar with him. It did not appear that J.E., Sr. had ever paid child support. J.E., Sr. did not actively pursue custody but asked the agency to consider placing his son with J.E., Sr.'s mother, W.E. ("W.E."), who worked swing shifts, did not have current knowledge of J.E., Jr.'s situation and was only interested in custody of J.E., Jr.

{¶15} The agency visited W.E.'s home that had two bedrooms and was deemed appropriate. W.E. did not have a criminal record, held a good job, and lived with her 17-year-old son who would stay with J.E., Jr. while W.E. was at work. W.E. did not want custody of the other children but said she would see that J.E., Jr. was permitted to spend time with them. Brown also believed that W.E.'s motion for custody had been dismissed for failure to attend court hearings.

{¶16} The Mother suggested that the children be placed with her mother, B.D., with whom the children had a good relationship and sometimes stayed with. However, B.D. had previously lost permanent custody of her six children, including the Mother, to CCDCFS and had a criminal background. In addition, the relationship between the Mother and B.D. was volatile.

{¶17} B.D. also had mental health issues and had recently failed a drug screen. She served a two-year prison term for felonious assault against one of her daughters and she did not have a good relationship with J.E., Sr.

{¶18} Z.D. was receiving ongoing therapy for post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD") and oppositional defiance disorder ("ODD"). Z.D. was also greatly impacted by the domestic violence incidents between J.E., Sr. and his Mother.

{¶19} The agency contacted the Mother's brother and children's uncle, R.D. and his wife, K.D., when the agency assumed temporary custody. The couple were licensed foster parents residing in Columbus, Ohio, and expressed an interest in taking the children.

They owned a large home and had two biological children and several foster children in the household. One child had completed college and a second was attending.

**{¶20}** The children could not be placed with R.D. and K.D. at that time because CCDCFS did not have a partnership agreement with the Columbus foster care agency. Subsequent to the initial contact, R.D. and K.D. completed the process to qualify for the placement and expressed a desire to adopt the children. Brown testified that the agency planned to move forward with placing the children with them so that the children, who resided in separate foster homes, could be together. She said that the children had been on several visits to Columbus and enjoyed going. They also have cousins there and a school has been identified.

**{¶21}** R.D. told Brown that the Mother contacted him shortly prior to her incarceration, apparently while awaiting sentencing, about moving to Columbus. R.D. told her they would welcome her and support her if she wanted to get herself together but he was not aware of her criminal activities at that time.

**{¶22}** R.D. informed the agency that he was otherwise estranged from his family, which he described as dysfunctional. B.D., R.D.'s mother, had accused him as a young teen of touching her inappropriately but there was no evidence or report and R.D. strongly denied it.

**{¶23}** R.D. and K.D., who already owned a large home, purchased a larger residence to accommodate the children. They told the agency that they wanted the children to have a better chance in life.

{¶24} Brown testified that Z.D. considered himself to be the protector of his siblings and that all of the children wanted to be together. She did not think that granting custody of J.E., Jr. to his paternal grandmother was in the children's best interest and reiterated that they should be placed together. The agency's plan was to place the children in Columbus. R.D. and K.D. demonstrated the greatest commitment to assuming custody of the children out of all of the proposed custodians.

### 2. Social Worker Wright.

{¶25} Social worker Ms. Wright ("Wright") joined her supervisor, Brown, on the case in September 2014. Wright met with the Mother several times and discussed case plan items. Wright informed her that, upon her release from custody, the agency would not expect to have the children move in with her as she would have to demonstrate stability. The Mother became very upset, stating it was not right for the agency to seek custody of her children and that she was wrongly convicted in the criminal case. Assistance was required to calm her.

{¶26} Wright confirmed that R.D. and K.D.'s new home had been certified for care. Wright accompanied the children to visits in Columbus that went very well. The children asked Wright each time they saw her when they could return to Columbus and whether they would be able to live with their aunt and uncle.

{¶27} Wright met W.E., J.E., Jr.'s paternal grandmother, in December 2014. W.E. was initially interested in the four children but she had a two- bedroom apartment and her 17-year-old son lived with her. Wright confirmed that W.E. passed her

background check, had sufficient income, worked a swing shift, and had other adult children, some of whom attended college. She also confirmed that J.E., Jr. had positive interactions with W.E.

{¶28} Wright testified that a former employee talked with H.M., the mother of L.K., Z.D.'s father. She was not aware of any follow up with H.M., or by H.M., after that point.

{¶29} Wright confirmed that the children were receiving various counseling services and that they would continue to receive services in Columbus. Contacts had already been established to assure a smooth transition.

{¶30} Wright was aware that B.D., the maternal grandmother, had a bond with the children. She testified about B.D.'s anger and impatience issues, mental health concerns, and seizure disorders that she fails to properly medicate.

**3. W.E.**

{¶31} W.E. testified that she successfully raised her adult children, is in good health, is employed as a stationary engineer, is fiscally and emotionally stable and would like custody of J.E., Jr. W.E. testified that she understood the responsibilities of permanent custody and the obligation to see that J.E., Jr. maintained a relationship with his parents and siblings. She confirmed that J.E., Sr. did not pay support and was recently employed because he had been incarcerated for a year. W.E. stated that she did not have a good relationship with the Mother and was aware of the violent history between the Mother and J.E., Sr.

### 4. B.D.

{¶32} B.D., the maternal grandmother, requested custody of all of the children. She said that she had a good relationship with them and has a three-bedroom home. B.D. claimed that her son, R.D., had touched her inappropriately when he was a young teen. She claimed that she told her case manager and therapist about the situation but nothing was done "because there was some more lies going around that was not true."

{¶33} B.D. said she would not allow the children, including J.E., Jr., to be around J.E., Sr. and that she had also accused him of inappropriate behavior with the female children, but the charges were dismissed. B.D. corrected the testimony regarding the removal by the agency of all of her children. She retained custody of a daughter, who is no longer in touch with her, and a son, with whom she still has a relationship.

{¶34} B.D. testified that her mental health is stable, although she admitted to seizures, fibromyalgia, and asthma. She confirmed her failure to pass a recent marijuana test. Her home visits with the children ended on Thanksgiving, but she did not attempt to visit with them at the Murtis Taylor agency location because she "was put on abandonment" by Murtis Taylor. B.D. made additional statements about social service failures. B.D. is also under case worker supervision.

### 5. Guardian Ad Litem.

{¶35} The children's guardian ad litem ("GAL") acknowledged the love of the Mother and B.D. for the children but, in light of the instability and issues, he recommended that Z.D., J.E., and J.D. be placed in permanent agency custody. The GAL

was unsure about a recommendation regarding J.E., Jr. and left it to the court. He did state that J.E., Jr. would have a good chance of succeeding with W.E. and would receive more individualized attention than if placed with his siblings. However, he also testified that all of the children were looking forward to going to live in Columbus.

### 6. Trial Court Findings.

{¶36} The trial court awarded permanent custody to CCDCFS. It is from that order that the Mother appeals.

## II. Assignment of Error

{¶37} The Mother presents a single assignment of error: that the trial court's order granting permanent custody to the CCDCFS was not based upon sufficient clear and convincing evidence. We do not agree.

## III. Law and Analysis

{¶38} This court has established that, to grant permanent custody to a county agency and terminate parental rights, the record must demonstrate by clear and convincing evidence, 1) the existence of one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (d); and, 2) that permanent custody is in the best interest of the child. The court must consider the five factors set forth in R.C. 2151.414(D) in making the latter determination. *In re: S.H.*, 8th Dist. Cuyahoga Nos. 97992, 97993, and 97994, 2012-Ohio-4064, ¶ 27.

{¶39} There are additional factors that a court must consider:

> The relevant factors include the following: 1) the interaction and interrelationship of the child with others; 2) the wishes of the child; 3) the

custodial history of the child; 4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and, 5) whether any of the factors in divisions (E)(7) to (11) apply. "Clear and convincing evidence" is that quantum of evidence that instills in the trier of fact a firm belief or conviction as to the allegations sought to be established. *In re: Y.V.*, 8th Dist. Cuyahoga No. 96061, 2011-Ohio-2409, ¶ 13, citing *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

The "best interest determination" focuses on the child, not the parent. *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994). The discretion that the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *Id*. at 316.

*In re S.H.* at ¶ 28-29.

{¶40} The trial court's entry for each of the children delineates the statutory considerations and determinations:

The interaction and interrelationship of the child with the child's parents, siblings, relatives and foster parents; the wishes of the child; the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and the report of the guardian ad litem, the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent. * * *

The child is not abandoned or orphaned or has not been in temporary custody of a public services agency or private placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period.

The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit or communicate with the child when able to

do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

The parent is incarcerated at the time of the motion for permanent custody or dispositional hearing.

**{¶41}** Thus, the record reflects that the trial court properly considered and determined the existence of the requisite conditions pursuant to R.C. 2151.414(B)(1)(a)-(d). The existence of a single factor alone can support a finding that the agency should be granted permanent custody of the child. *In re S.G.*, 8th Dist. Cuyahoga No. 100441, 2014-Ohio-1088, ¶ 16, citing *In re William S.*, 75 Ohio St.3d 95, 1996-Ohio-182, 661 N.E.2d 738.

**{¶42}** The record further sustains the court's proper consideration and determination of the best interests of the children under R.C. 2151.414(D) and (E). An extensive inquiry into the agency's investigation of potential custodians was entertained at the hearing as well as an analysis of who was in the best position to raise the children. Most of the potential custodians had a history of, or current issues with, incarceration, mental health, physical challenges and/or drugs.

**{¶43}** The investigation of H.M., Z.D.'s paternal grandmother, as a potential custodian for Z.D., appears to have been limited but the evidence reflects that contact was initiated. H.M. did not attempt to follow up with the agency. While J.E., Jr.'s paternal grandmother was a viable custodian, he would be separated from his siblings. In both situations, the children would be separated.

**{¶44}** There is substantial evidence that the Mother is not in a position to care for the children. She is incarcerated and has mental health concerns. The Mother has a long history with CCDCFS due to child neglect including exposing the children to domestic violence incidents. This court does not dispute the love of the Mother for her children; however, she has demonstrated an inability to provide the home and security the children need. *See In re J.C.*, 4th Dist. Adams No. 07CA834, 2007-Ohio-3783, ¶ 28. ("The parents, while they undoubtedly love their children, have been unable to provide them with appropriate care and basic necessities. * * * Through the permanent custody award, their basic needs will be met.").

**{¶45}** The testimony by Brown was that R.D. and K.D., the maternal aunt and uncle, (1) are the only ones who consistently and actively demonstrated their commitment to caring for all of the children; (2) purchased a new home to accommodate the children; (3) expanded their certified foster care license to partner with CCDCFS; (4) desire to adopt the children; and (5) have successfully raised children who attended college. The children also have cousins in the Columbus area and supportive counseling services have already been established.

**{¶46}** The manifest weight of the evidence is clearly and convincingly in support of the trial court's award of permanent custody to the agency. The record supports the presence of that "quantum of evidence that instills in the trier of fact a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

**{¶47}** While the GAL deferred to the trial court in determining whether it was in J.E., Jr.'s best interest to be placed with his paternal grandmother or his aunt and uncle along with his siblings, he testified and stated in his GAL report[1] that it was in the children's best interest to live with their aunt and uncle in Columbus. "It is clearly in their best interest and it is believed they would do well with their uncle in Columbus. They have done well in their limited visits with him and are eager to move and be with him. It is almost as though they sense they have a chance for 'something more in life.'"

**{¶48}** The GAL also stated in his report that if custody were awarded to the Mother or maternal grandmother B.D., at best, the children might stay out of the system or perhaps finish high school. "The children deserve more than this. They deserve a chance to succeed." We agree. The appellant's single assignment of error is overruled.

**{¶49}** The juvenile court's order is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

[1] Second Supplemental Guardian Ad Litem Report, February 25, 2015.

ANITA LASTER MAYS, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
SEAN C. GALLAGHER, J., CONCUR