[Cite as *In re P.S.*, 2016-Ohio-3489.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | | JUDGES: |
| IN THE MATTER OF: P.S. & T.S., | : | Hon. W. Scott Gwin, P.J. |
| Dependent Children | : | Hon. William B, Hoffman, J. |
| | : | Hon. John W. Wise, J. |
| | : | |
| | : | |
| | : | Case No. 16-CA-11 |
| | : | |
| | : | |
| | : | O P I N I O N |


CHARACTER OF PROCEEDING:       Civil appeal from the Licking County Court of Common Pleas, Juvenile Division, Case Nos. F2014-699 and F2014-700

JUDGMENT:       Affirmed

DATE OF JUDGMENT ENTRY:       June 16, 2016

APPEARANCES:

KARRIE PRATT KUNKEL
Assistant Prosecuting Attorney
20 S. Second St., 4th Floor
Newark, OH 43055

MICHAEL R. DALSANTO
33 West Main Street, Ste. 106
Newark, OH 43055

*Gwin, P.J.*

{¶1}    Appellant M.S. appeals from the February 5, 2016 judgment entry of the Licking County Court of Common Pleas, Juvenile Division, overruling the objections of appellant, approving and adopting the magistrate's decision, terminating his parental rights, and granting permanent custody of P.S. and T.S. to the Licking County Department of Job and Family Services ("LCDJFS").

*Facts & Procedural History*

{¶2}    M.S. is the father ("Father") of P.S., born March 8, 2006 and T.S., born September 11, 2012.  On October 22, 2014, LCDJFS filed a dependency complaint with regards to P.S. and T.S.  The complaint alleged, in part, that the children's mother had been evicted from her home, her current boyfriend had a history of domestic violence, the children had not been in school since October 9th, the former family home had multiple holes in the walls, and the former family home had twenty to thirty empty vodka bottles strewn around the home.  The complaint further stated Father was incarcerated for felonious assault where the children's mother was the victim of the crime.  The complaint finally alleged LCDJFS had been involved with the family seven (7) times since 2005, both P.S. and T.S. had previously been found dependent in a 2012 case, and both were previously in foster care.

{¶3}    On October 21, 2014, the trial court issued an emergency ex parte order of removal.  A magistrate's order issued on October 24, 2014 found it was in the children's best interest to be placed in emergency shelter care and found the agency made reasonable efforts to prevent removal.  An adjudicatory hearing was held on December 18, 2014.  Father's attorney appeared at the hearing.  In a December 22, 2014

magistrate's decision on the adjudicatory hearing, the magistrate found P.S. and T.S. dependent by clear and convincing evidence. The magistrate also found LCDJFS made reasonable efforts to prevent the children's removal. No objections were filed to the magistrate's decision and the trial court approved and adopted the magistrate's decision.

{¶4} In January of 2015, both paternal grandmother Francis Kurtz ("Kurtz") and paternal aunt Josephine Naylor ("Naylor") filed motions to intervene in the case and/or motions for legal and temporary custody of P.S. and T.S.

{¶5} A dispositional hearing was held on January 14, 2015. Father's attorney was present at the hearing. After the dispositional hearing, the magistrate issued a decision on January 16, 2015. The magistrate found it was in the best interest of the children to be placed in the temporary custody of LCDJFS. The magistrate found the agency made reasonable efforts to prevent the children's removal and made reasonable efforts to achieve reunification. The magistrate specifically noted the agency has worked with the family since 2005 and held temporary custody of the children from 2012 until 2014. The magistrate denied both the grandmother and the aunt's motions to intervene. Finally, the magistrate approved the case plan and granted the children's mother supervised visitation. No objections were filed to the magistrate's decision. The trial court thus adopted and approved the magistrate's decision.

{¶6} On January 30, 2015, LCDJFS filed a motion for permanent custody of P.S. and T.S pursuant to R.C. 2151.413(A) and R.C. 2151.414(B)(1)(d). The permanent custody motion stated there were prior dependency actions for the children in September of 2012 due to housing and employment concerns and the agency first became involved with the family in 2005. Further, there has been a consistent pattern of instability. The

motion also stated the children were adjudicated dependent in November of 2012 due to unsafe housing and a domestic violence incident where Father drove into the children's mother with his vehicle. Custody of the children was returned to the children's mother in October 1, 2014 and the children were removed again on October 21, 2014 due to lack of housing, lack of employment, and the lack of ability to provide a safe and stable home. The motion finally stated the agency had custody of the children from March 30, 2013 until the end of July of 2014, and again from October 21, 2014 to the date of the motion.

{¶7} The trial court set a hearing on the motion for permanent custody on March 23, 2015. Father filed a motion to continue the hearing due to the unavailability of several of his witnesses. The magistrate initially denied Father's motion for continuance, but ultimately granted the motion to continue and set the hearing for May 11th, when all of Father's witnesses were available.

{¶8} On March 5, 2015, Father filed a motion for visitation. On March 9, 2015, the trial court entered a judgment entry on the semi-annual review in the case. Both Father and his attorney were present at the semi-annual review. The trial court found reasonable efforts were made to return the children to the home and to finalize the permanency plan in effect. The trial court also denied Father's motion for visitation. On March 9, 2015, the guardian ad litem for the children filed a report. The report stated that while the guardian ad litem did not support return of custody to the child's mother or Father, she did not support the agency's motion for permanent custody unless the agency and the foster parents could demonstrate the children would be safe in the foster home. The guardian ad litem was concerned with the number of children in the foster home.

{¶9}  A trial on the agency's motion for permanent custody and Kurtz's and Naylor's motions for legal custody was held on May 11 and May 12.  Due to the need for a third day of trial testimony and the schedules of the parties and witnesses, the last day of the trial was held on July 2.  Initially, the magistrate dismissed Kurtz's motion for legal custody because she failed to appear for the hearing.  The magistrate then took testimony and evidence regarding both Naylor's motion and the agency's motion.  Though the magistrate held the testimony in separate segments, all parties stipulated that all of the evidence presented with regards to Naylor's motion could be considered for the permanent custody motion.

{¶10}  Naylor testified that prior to the 2012 case, the children spent time at her home when they were young, but over the years she had lost touch with them and Father due to them moving further away.  She did not write the children letters.  When Naylor estimated the amount of times she saw the children, she stated "probably no less than 10; no more than 15."  Approximately two months prior to the hearing, Naylor attended a visit with the children at the agency for approximately forty-five minutes.  The visit was the only time she had seen the children in the previous two-and-a-half years.

{¶11}  Father testified he went to prison in 2012 for felonious assault and domestic violence.  The children's mother was the victim of this domestic violence incident.  Father stated he and the children's mother had a history of domestic violence prior to that incident. When asked whether the children witnessed domestic violence, Father testified if they did, it was only on one or two occasions.  Father was released into a halfway house on transitional control at the end of February of 2015, but stated he is still technically an inmate.  At the time of the permanent custody hearing, Father resided in the halfway

house and had three months left in the halfway house.  After he is released from the halfway house, Father has three years of post-release control.

{¶12}  Father has been employed since March 12, 2016 and stated he has sufficient income to support himself.  Father testified that, while he was incarcerated, he completed multiple substance abuse programs and treatments and anger management programs.  Father stated he currently attends Mid-Ohio Psychological.  Father testified he is not one hundred percent sure what is in the best interest of the children since he has not seen them in so long and does not know how they will interact with him, but Father wants visitation and to eventually get custody of the children.

{¶13}  Rebecca Inboden ("Inboden") is the ongoing caseworker at LCDJFS for P.S. and T.S.  She first became involved with the family in November of 2013.  The children's mother has two older children who are in the custody of paternal relatives. Father is not the father of the two older children.  The initial concerns the agency had with the family included chronic homelessness, economic instability, poor environment, unsafe and unsanitary home, and the children's Mother and Father being involved in a domestically violent relationship.

{¶14}  In the 2012 case, the agency developed a reunification case plan for both parents.  The initial concerns on the case plan included mental health concerns and substance abuse problems.  The objectives on Father's case plan included:  complete a mental health assessment and follow any recommendations; complete a medication evaluation; complete a substance abuse assessment; random drug screens; obtain employment; maintain independent housing; show a long-term pattern of sobriety which does not include incarceration; and attend intensive counseling and anger management

due to domestic violence issues. Father was subsequently removed from the case plan due to his extended incarceration. Inboden testified she never met with Father to discuss any objectives or concerns because he was incarcerated. She did not offer him any services because he was incarcerated. However, Inboden stated that Father could pursue services without a referral from her. Father wrote letters and sent the children gifts while he was in prison.

{¶15} Inboden testified she received a letter from the Community Transition Center that Father was participating in treatment services, including random drug screens. Inboden stated once a motion for permanent custody is filed, it is not typical for a caseworker to continue contact with the parents, but she could provide a support service if a parent specifically seeks that service out. Inboden testified services are available and can be utilized, but no party came forward indicating a need or willingness to have these services. Inboden stated Father cannot complete the remaining services within the next few months because it would exceed twelve months of the children being in temporary agency custody. Further, Inboden testified the children need a safe and stable environment.

{¶16} As to the 2014 case, Inboden stated the concerns were as follows: the home lacked food, the children were absent from school for a long period of time, the home was in deplorable condition, there were multiple empty alcohol bottles at the home, and multiple holes in the wall of the home. Inboden testified the children's mother visits the children and they are bonded to her. Inboden stated Father has not seen the children since September of 2012. Inboden does not think the children can be reunified with Father in the foreseeable future because he is living in a halfway house and has extensive

historical concerns with unemployment, alcoholism, and being transient. Further, the family has been involved with LCDJFS since 2005.

{¶17} When asked about reasonable efforts provided by the agency, Inboden testified the agency provided the children's mother with gas cards, clothing, shoes, and transportation. Inboden stated there were no other services the agency could offer either parent to remedy the concerns of the agency and achieve reunification.

{¶18} Since the children have been placed in the foster home in October of 2014, Inboden testified they have had periods of progression and improvement with behavioral and emotional issues. However, they have improved recently. Academically, the children do well. The children were originally placed in this foster home in April of 2014 and stayed there until the end of July of 2014. They were placed there again in October of 2014. The foster parents have four or five adopted children and several foster placements. Both foster parents are self-employed so at least one of the parents is home full-time. Inboden testified P.S. and T.S.'s needs are being met by the foster family and the family fosters a relationship between them and their older siblings. Inboden stated the children are bonded with the foster parents and family and the foster family is interested in adoption.

{¶19} Inboden testified the children's problems are likely due to post-traumatic stress disorder and have included smearing feces, running out of the room at school, night terrors, and the inability to deal with any level of change. T.S. is combative, angry, aggressive, and tries to slap and hit his foster mother.

{¶20} With regards to relative placements, Inboden stated she considered Naylor as a placement, but there were three investigations from 1989 to 2003 where Naylor was named as an alleged perpetrator of abuse and neglect; one of these was substantiated

and two were unsubstantiated. Because there was a substantiated finding, Inboden stated the kinship unit would not be able to approve her for placement pursuant to the agency's policy. Inboden further testified Naylor has not seen the children for over two years. Additionally, Inboden stated she would be apprehensive to place the children with Naylor because of their mental health and behavioral/emotional issues and because Naylor has not had a relationship with the children for several years and is not familiar with their needs. The children were placed with Kurtz, but the placement dissolved when Kurtz was visibly intoxicated at an unannounced visit by LCDJFS.

{¶21} Inboden testified it is in the best interest of the children for the trial court to grant LCDJFS permanent custody.

{¶22} Mackenzie Peterson ("Peterson") is a psychologist who first met the children in 2012. Peterson testified when the children were removed from their mother in October of 2014, both had regressed in terms of behavior and attitude from where they were when they were returned to Mother in July of 2014. T.S. had aggression she had never seen before. P.S. told Peterson he wants to go home with his mother but, if he can't, wants to stay with the foster family. As to their foster siblings, P.S. and T.S. will say they are not happy with a particular foster sibling, but they do not tell Peterson they are unhappy at the foster home. T.S. never said anything to Peterson about Father. P.S. told Peterson he missed Father, but also told her he is scared of him because he witnessed domestic violence at home and said Father hit him.

{¶23} Peterson testified there are ongoing concerns for both children, including attachment issues for both, and she recommends both continue in counseling and attachment therapy. Peterson would be very concerned about a new placement for the

children as the children have been in this foster home for two-and-a-half years and have a bond with the foster family. Peterson testified the foster home is consistent and safe. Further, another removal or transition could be very detrimental to their emotional well-being. Peterson believes it is in the best interest of the children to remain with the foster family, as they are connected, have developed a bond, and their needs are being met by the foster family.

{¶24} On cross-examination, Peterson testified the children might be able to develop a bond with a family member, but she does not think it is worth the risk because the children are already really struggling emotionally and having issues with attachment. She is concerned that each removal, even if placed with a family member, creates more issues, more loss, and more damage. Peterson also has concerns about continuing the case for six months with visitation by Naylor because the case has gone on so long in the children's lives that they will not achieve a sense of permanency and it would make it harder for the children to settle and deal with their emotional issues. Peterson does not believe the behavior of the children is a result of the foster parents; rather their behavior is the result of the disappointment and loss of being back in foster care. The children had hoped they were going home and lost that hope.

{¶25} Dorothy Moorehead, the foster mother of the children, testified when the children first came to their home in 2012, T.S. had severe night terrors and wet the bed, while P.S. had anger issues. After the children returned to their home in 2014, Dorothy stated T.S. was screaming, bed-wetting, hitting, and biting. P.S. still has anger issues. Dorothy testified the children's behavior is improving. P.S. is doing well academically, but does not have many friends. Dorothy is in constant communication with the school about

the children. Dorothy is bonded with P.S. and T.S. and testified they do lots as a family. She is interested in adopting P.S. and T.S. Dorothy testified there are currently eleven children in their home. They have five adopted children and the remainder are foster children. Dorothy testified she facilitates a relationship between P.S., T.S., and their two older siblings.

{¶26} P.S.'s teacher testified P.S. is doing well academically and his happiness is improving. Further, P.S. is very quiet, very reserved, and does not want to talk about his family or his foster home. T.S.'s teacher testified she has seen growth in T.S.'s behavior and he is doing well academically. T.S. used to run out of the classroom and hide. When T.S. visits his mother, he usually has a difficult day. T.S. does not talk about his family or foster family.

{¶27} Father's sponsor at a twelve-step program testified he believes Father is dedicated to transforming his life. A.S., the children's mother, testified she had a violent relationship with Father. Naylor testified that Father is stable now. Mike Selegue, a staff clinician, sees Father. Selegue stated Father has made progress and would probably benefit from parenting time with his children, but also admitted he has never met the children. Selegue did not really know about the incident leading to Father's incarceration.

{¶28} During the evidentiary hearing, the magistrate denied Naylor's motion for custody. The magistrate issued a written decision on December 16, 2015 after taking the motion for permanent custody under consideration. The magistrate found the children were initially removed from the home in September of 2012 and returned to their mother in July of 2014 on extended visitation and then to her temporary custody on September 30, 2014. The children were initially removed from the home in 2012 because the home

was filthy, dangerous, Father and the children's mother were behind in rent, and because Father ran over the children's mother with his car. After the children were returned to their mother on September 30, 2014, they were subsequently removed on October 21, 2014 when their mother became homeless and a new complaint was filed.

{¶29} The magistrate stated Father is an alcoholic with a history of domestic violence as he ran over the children's mom with a car. Father was convicted of felonious assault and has not seen the children since September of 2012. The magistrate found that while Father testified he had employment and was currently sober, Father had a long history of involvement with the agency, had a history of alcoholism and domestic violence, and has had no history of unsupervised sobriety. Further, Father lacks a relationship with the children. Thus, the magistrate determined Father is not an appropriate parent currently or within the foreseeable future.

{¶30} The magistrate found that though the guardian ad litem is concerned about the foster home where the children are placed and would rather see the children placed with relatives, the foster home is the only stability in the last three (3) years that the children have known. Further, no relatives came forward in the case until the motion for permanent custody was filed, despite the agency involvement with the family for ten years. The magistrate found the stability in the known environment outweighs the gamble on relatives with virtually no relationship with the children.

{¶31} The magistrate found the agency made reasonable efforts as they worked with the family for many years and had multiple case plans. The magistrate determined there was clear and convincing evidence the parents are incapable of meeting the children's needs now or in the foreseeable future; further, it is in the best interest of the

children for permanent custody to be granted to LCDJFS. The magistrate thus concluded as follows: the children cannot be placed with either parent within a reasonable period of time; the need for permanent placement cannot be achieved without granting permanent custody to the agency; and both parents failed continuously and repeatedly to remedy the conditions which existed at the time of the removal. The magistrate also stated the agency and guardian ad litem should review placement options in the children's best interest.

**{¶32}** Father filed objections to the magistrate's decision and argued no reasonable efforts were made by the agency with regards to him. The trial court issued a judgment entry on February 5, 2016. The trial court denied Father's objections, approved and adopted the magistrate's decision, terminated the parental rights of Father and the children's mother, and granted permanent custody of P.S. and T.S. to LCDJFS. The trial court stated neither the agency nor the guardian ad litem believes Father is an appropriate guardian for the children. The trial court also found Father failed to include in his objections references to the transcript and thus the objections were legally insufficient.

**{¶33}** Father appeals the February 5, 2016 judgment entry of the Licking County Court of Common Pleas, Juvenile Division, and assigns the following as error:

**{¶34}** "I. THE TRIAL COURT ERRED WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT THE AGENCY PROVIDED REASONABLE CASE PLANNING AND DILIGENT EFFORTS.

**{¶35}** "II. THE TRIAL COURT ERRED WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT THE AGENCY MADE REASONABLE EFFORTS TO ACHIEVE REUNIFICATION.

**{¶36}** "III. THE TRIAL COURT ERRED WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT THE MOTION FOR PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILDREN."

*Permanent Custody*

**{¶37}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

**{¶38}** Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477. If some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶39}** Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is

"crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

{¶40} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency.

{¶41} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶42} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

I. & II.

*Reasonable Efforts & Reasonable Case Planning / Diligent Efforts*

**{¶43}** Father argues the trial court erred in determining the children could not be placed with either parent within a reasonable time. Specifically, Father contends the trial court erred in finding LCDJFS provided reasonable case planning and diligent efforts and made reasonable efforts to achieve reunification. We disagree.

**{¶44}** As to reasonable efforts, R.C. 2151.419(A)(1) requires a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816. Thus, by its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414. *Id.* Therefore, the trial court was not required to make a specific finding that LCDJFS had made reasonable efforts to reunify the family. *Id.*

**{¶45}** Father argues that even though his appeal does not originate from one of the types of hearings specifically referenced in R.C. 2151.419(A), LCDJFS must establish reasonable efforts have been made since it was not established previously that such reasonable efforts had been made. Father is correct that if the agency has not established reasonable efforts were made prior to the hearing on the motion for permanent custody, then it must demonstrate such efforts at that time. *Id.*

**{¶46}** However, in this case, the agency established that reasonable efforts were made prior to the hearing on the motion for permanent custody. At the adjudicatory hearing in December of 2014, the magistrate made a reasonable efforts finding and the trial court approved and adopted the magistrate's decision. At the dispositional hearing in January of 2015, the magistrate again made a reasonable efforts finding and the trial court approved and adopted the magistrate's decision. At a semi-annual review hearing in March of 2015, the trial court made a reasonable efforts finding. Father did not object to the reasonable efforts findings by either the magistrate or the trial court when the magistrate and trial court entered its adjudication order, disposition order, or judgment entry on the semi-annual review. These findings were all made prior to the hearing on the motion for permanent custody. Therefore, the showing of reasonable efforts was not required to be proven by the state or found by the trial court during the permanent custody hearing. *In re J.J.F.*, 5th Dist. Stark No. 2009-CA-00133, 2009-Ohio-4736.

**{¶47}** While the agency did not have to show reasonable efforts at the permanent custody hearing, to the extent that the trial court relies on R.C. 2151.414(E)(1) at a permanent custody hearing, the court must examine the reasonable case planning and diligent efforts by the agency to assist the parents when considering whether the child cannot and should not be placed with the parent within a reasonable time. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816. The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. *In re J.D.*, 3rd Dist. Hancock Nos. 5-10-34, 2011-Ohio-1458.

**{¶48}** Father specifically contends the agency failed to offer him a case plan. At the dispositional hearing, the magistrate approved the case plan in the case and incorporated it into the magistrate's decision. The trial court adopted and approved the magistrate's decision. Father did not raise any of the objections with regard to the case plan before the magistrate or trial court at the dispositional hearing or at a time when the magistrate or trial court could have corrected any error. Therefore, Father forfeited the opportunity to raise alleged case plan deficiencies on appeal. *In the Matter of C.B.C.*, 4th Dist. Lawrence No. 15CA18, 15CA19, 2016-Ohio-916; *In re N.L.*, 9th Dist. Summit No. 27784, 2015-Ohio-4165; *In re Willis*, 5th Dist. Coshocton No. 02CA15, 2002-Ohio-6795.

**{¶49}** Further, this Court has recognized an implied exception when case planning efforts would be futile. *In re Chestnut Children*, 5th Dist. Guernsey No. 05 CA 39, 2006-Ohio-684; *In re J.H.*, 5th Dist. Licking No. 14-CA-94, 2015-Ohio-667. The agency has been involved with the family since 2005. Father was originally included in a case plan in the 2012 case, but was removed after he was sentenced to three years in prison. As of the date of the filing of the permanent custody motion, the children had been in the temporary custody of the agency for over two years: from March 2013 until July 2014 and from October 21, 2014 to the date of the motion on January 30, 2015.

**{¶50}** Father was incarcerated when the motion for permanent custody was filed and was on transitional control, living in a halfway house, at the time of the permanent custody hearing. Due to his incarceration since 2012, Father has not had any visits with the children and had only limited contact through letters and gifts. Father has a history of substance abuse issues and issues with chronic homelessness. Reunification is futile until a parent is released from incarceration and obtains a stable home. *In re N.A.P.*, 4th

Dist. Washington No. 12CA30, 2013-Ohio-689. Here, Father was incarcerated when LCDJFS obtained temporary custody and remained incarcerated at the time the motion for permanent custody was filed. Though Father was in a halfway house at the time of the hearing, he was still incarcerated and his release date was not until the end of August of 2015, over seven months after the motion for permanent custody was filed. Inboden testified she does not think the children can be reunited with Father in the near future because he is living in a halfway house, has an extensive history with unemployment, has a history of being transient, and a history of alcoholism. Further, Inboden stated Father has no history of unsupervised sobriety and the children need a safe and stable environment.

{¶51} As we stated in *In re Chestnut Children*, 5th Dist. Guernsey No. 05 CA 39, 2006-Ohio-684, "* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * parent an opportunity to prove [his] suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the parent * * *." We further stated, "the law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm." *Id.* Accordingly, any failure by the part of LCDJFS to make reasonable case planning and diligent efforts was harmless error because, under the specific facts of this case, any attempt at reunification would have been futile. *Id.*

{¶52} Beyond maintaining the children in its temporary custody pending Father's release from transitional control and waiting to see if he could secure housing, maintain employment, and maintain his sobriety when not incarcerated, it is not clear what other

efforts LCDJFS could have undertaken to remove the obstacle preventing reunification between Father and the children. See *In the Matter of C.B.C.*, 4th Dist. Lawrence No. 15CA18, 15CA19, 2016-Ohio-916. Inboden stated that once a motion for permanent custody is filed, it is not typical for a caseworker to continue services with the parents. Inboden testified services are still available, but no party, including Father, contacted her indicating a need or willingness to have these services. Peterson strongly recommended against continuing the case for six months since the children have been in agency custody for so long and testified the children need permanency to settle and deal with their emotional and attachment issues. As noted by the Fourth District, the permanent custody statutes do not appear to contemplate holding a child in custodial limbo while a parent completes a prison term. *Id.*; See R.C. 2151.413(D)(1) (requiring children's services agency to seek permanent custody when a child has been in its temporary custody for more than twelve out of the past twenty-two months) and R.C. 2151.414(D)(2)(b) (stating that the court shall award permanent custody if it finds, among other things, that a child has been in an agency's custody for two years or longer.)

**{¶53}** Father's first and second assignments of error are overruled.

III.

**{¶54}** In his final assignment of error, Father argues the trial court erred in finding an award of permanent custody was in P.S. and T.S.'s best interest. Father specifically contends the trial court disregarded the report by the guardian ad litem and should have considered the relative placement of Naylor.

**{¶55}** We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child

should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), citing *In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

**{¶56}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child and (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. No one element is given greater weight or heightened significance. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816.

**{¶57}** A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. The willingness of a relative to care for the child does not alter what a court considers in determining permanent custody. *In re Patterson,* 134 Ohio App.3d 119, 730 N.E.2d 439 (9th Dist. 1999); *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991). Accordingly, a court is not required to consider placing a child with a relative prior to granting permanent custody to an agency. *In re M.H.*, 5th Dist. Muskingum No. CT2015-0061, 2016-Ohio-1509.

{¶58} The court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute. *In re Schafer*, 11 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532. *In re Schafer* made it clear that a trial court's statutory duty, when determining whether it is in the best interest of a child to grant permanent custody to an agency, does not include finding by clear and convincing evidence that no suitable relative was available for placement. *Id.* R.C. 2151.414 "requires the court to find the best option for the child once a determination has been made pursuant to R.C. 2151.414(B)(1)(a) through (d). The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* at 111.

{¶59} The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 642 N.E.2d 424 (8th Dist. 1994).

{¶60} We find the trial court did not err in finding that granting permanent custody to LCDJFS was in the best interest of P.S. and T.S. Inboden testified that while the children have had periods of progression and regression, they have improved recently. Academically the children are doing well. The foster mother stated the children's behavior is improving, she is bonded with them, and she and her husband are interested in adopting the children.

{¶61} While the guardian ad litem was concerned with the foster family the children are placed in due to the other children in the home, both Inboden and Peterson

testified the children's needs are being met by the foster parents and the children are bonded with the foster parents. Inboden testified the foster family has facilitated visits with the children's older siblings.

{¶62} The guardian ad litem did not recommend placement of the children with either their mother or Father, but did not support the motion for permanent custody because she felt the children should be placed with a relative, possibly Naylor. However, Inboden stated because there was a substantiated finding against Naylor, the kinship unit would not be able to approve her for placement pursuant to agency policy. As previously noted by this Court, "a relative's past history is a relevant factor for a court to consider when determining whether it is in a child's best interest to grant custody to the relative." *In re M.H.*, 5th Dist. Muskingum No. CT2015-0061, 2016-Ohio-1509.

{¶63} Inboden testified she would be apprehensive to place the children with Naylor due to her history, because she has not seen the children for two years, and because of their mental health and behavioral/emotional issues. Peterson stated she would be concerned about a new placement for the children because they have been in this foster home for two-and-a-half years and have a bond with the family. The home is safe and consistent. Peterson testified another removal or transition could be very detrimental to the children's emotional well-being. Peterson testified that while the children might be able to develop a bond with a family member, it is not worth the risk because the children are already struggling emotionally and have issues with attachment. Peterson stated each move, even with a family member, creates more issues, more loss, and more damage. When asked about continuing the case for six months for the children to visit Naylor, Peterson stated she does not recommend continuing the case since the

children have been in agency custody so long.  Further, Peterson testified the children need permanency to settle and deal with their emotional and attachment issues.

{¶64}  Inboden testified it is in the best interest of the children for the court to grant LCDJFS' motion for permanent custody.  Peterson believes it is in the best interest of the children to remain with the foster family.  As noted by the trial court, no family members came forward until the motion for permanent custody was filed, despite agency involvement with the family since 2005.  While Father wants to eventually get custody of the children and believes that would be in their best interest, the children have the right to "stable, secure, nurturing, and permanent homes in the near term."  *In re Awkal*, 95 Ohio App.3d 309, 642 N.E.2d 424 (8th Dist. 1994).

{¶65}  Additionally, Father has a conviction for felonious assault and domestic violence, admitted he had a domestically violent relationship with the children's mother, has a history of alcoholism, has a history of unemployment, and a history of homelessness.  The agency has been involved with the family since 2005.  Further, Father testified the children may have seen domestic violence between him and their mother once or twice and P.S. told Peterson that Father hit him.  Whether Father would give the children stability of a permanent home upon his release from transitional control incarceration is not certain.  Although Father testified that upon his release from transitional control he will lead a law-abiding life to care for the children, the trial court was entitled to discredit Father's testimony.  Given his history, the trial court could have reasonably concluded Father would be unlikely to provide the children with a permanent, stable home.  Courts have recognized that, "* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * parent an opportunity

to prove [his] suitability.   * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm." *In the Matter of Lilley*, 4th Dist. Lawrence No. 04CA22, 2004-Ohio-6156.

{¶66}  We find the trial court properly considered and weighed the factors in R.C. 2151.414(D) and the trial court's conclusion that the granting of permanent custody to LCDJFS is in the best interest of P.S. and T.S. is supported by competent and credible evidence.  Father's third assignment of error is overruled.

{¶67} Based on the foregoing, we find the trial court did not abuse its discretion in granting permanent custody of P.S. and T.S. to LCDJFS. Father's assignments of error are overruled and the February 5, 2016 judgment entry of the Licking County Common Pleas Court, Juvenile Division, is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Wise, J., concur