[Cite as *In re Z.W.*, 2021-Ohio-3412.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT


|                           | JUDGES:                          |
| IN THE MATTER OF:         | Hon. Craig R. Baldwin, P. J.     |
|                           | Hon. John W. Wise, J.            |
| Z.W.                      | Hon. Patricia A. Delaney, J.     |
|                           |                                  |
| Dependent Child           | Case No. 2021CA0015              |
|                           |                                  |
|                           | O P I N I O N                    |


CHARACTER OF PROCEEDING:    Appeal from the Court of Common Pleas,
                            Juvenile Division, Case No. 21830070


JUDGMENT:                   Affirmed


DATE OF JUDGMENT ENTRY:     September 27, 2021


APPEARANCES:

For Appellant Mother                For Appellee CCJFS

JEFFREY A. MULLEN                   SARA R. CHISNELL
PUBLIC DEFENDER OFFICE              COSHOCTON COUNTY JFS
239 North Fourth Street             725 Pine Street
Coshocton, Ohio  43812              Coshocton, Ohio  43812

*Wise, J.*

**{¶1}** Appellant, Q.C., appeals the decision of the Coshocton County Court of Common Pleas, Juvenile Division, which terminated Appellant's parental rights and granted Coshocton County Department of Job and Family Services' ("Agency") motion for permanent custody of Z.W. The following facts give rise to this appeal.

## FACTS AND PROCEDURAL HISTORY

**{¶2}** Z.W. was born on August 23, 2015. Appellant is the biological mother of Z.W., and G.W. is the natural father of Z.W.

**{¶3}** On October 17, 2018, the Agency made a request for an *ex parte* order for temporary custody of Z.W. The trial court granted the order on the same day.

**{¶4}** On October 18, 2018, the Agency filed a complaint alleging Z.W. was a dependent and neglected child due to drug usage of the parents, domestic violence by the parents, parental mental health issues, unstable living conditions, and the parents' prior history of non-compliance with the Agency. The Agency also requested visitation be at the discretion of the Agency and that the parents comply with the Agency.

**{¶5}** On February 22, 2019, the trial court made a finding Z.W. was dependent and ordered continued custody with the Agency. The trial court ordered Z.W.'s parents to comply with the terms of the case plan, including completing an assessment at Coshocton Behavioral Health Choices and submit to all drug screenings.

**{¶6}** Appellant tested positive for Percocet in December of 2019, and for methamphetamine, amphetamine, and fentanyl on March 13, 2020, seven days prior to giving birth to Z.W.'s sibling, Appellant's third child. When Tuscarawas County Juvenile

and Family Services attempted to gain custody of the baby, Appellant hid the baby away in Coshocton County.

{¶7}   On June 11, 2020, the Agency filed a motion for permanent custody of Z.W.

{¶8}   On October 23, 2020, the trial court held a hearing on the motion for permanent custody. G.W. was not present at the hearing.

{¶9}   At the hearing, caseworker Chelsea Distelhorst testified first. Distelhorst testified she was employed by the Agency as an intake caseworker and was previously an ongoing worker for Z.W. The Agency received allegations that Appellant was hallucinating, acting paranoid, that she had been evicted from her apartment, and that there had been incidents of domestic violence between Appellant and G.W. While the police department was questioning Appellant, she was arrested for possessing an illegal substance. Appellant reported to intake worker Lauren Basham that she was afraid for her life, that G.W. was beating her, and that he abused Z.W.

{¶10} Distelhorst also testified that the Agency received temporary custody of Z.W. on October 17, 2018, and was unable to place Z.W. with her grandmothers as both had criminal histories. Z.W. was placed with the Kittrell family, but was shortly relocated to another family, the Morton's.

{¶11} Distelhorst continued that on December 5, 2018, the Agency completed a case plan for Appellant to cooperate with all home visits, cooperate with the Agency and maintain plan goals, submit to unannounced random drug screens, complete assessment at Coshocton Behavioral Health Choices and follow all recommendations, obtain employment and housing, attend supervised visitation with Z.W., and protect Z.W. from further abuse and neglect.

**{¶12}** The case plan for G.W. was to cooperate with in-home visits, complete behavior health assessments and follow recommendations, submit to random drug screen, attend supervised visits, obtain employment and housing, and protect Z.W. from abuse and neglect. The agency was unable to review the case plan with G.W. but did with Appellant.

**{¶13}** On December 19, 2018, Appellant tested positive for methamphetamines.

**{¶14}** In December of 2018, Appellant completed her behavioral health assessment in January of 2019. G.W. completed his assessment in May of 2019, but never followed up on recommendations. G.W. was unable to provide verification of employment but was living at home with his mother.

**{¶15}** Appellant completed her behavioral health assessments and followed through on the recommendations. After her discharge from the behavioral health program, Appellant was sporadic in contacting the Agency.

**{¶16}** In the winter of 2019 she started missing visits, and in February she brought Greg to a visit even though he was not permitted.

**{¶17}** Distelhorst testified Angela King, Z.W.'s godmother, contacted the Agency to become a temporary foster parent for Z.W. King indicated to Distelhorst that she has a relationship with Appellant and Appellant's mother. The Agency said they would move Z.W. for a permanent placement but did not want to continue moving her from place to place unless in an attempt to establish some permanency. King was not willing to be considered for kinship placement during her first contact with the Agency.

**{¶18}** Z.W. was moved about a month after the Agency spoke with King. The Agency did not consider King for either kinship placement or foster placement at that time.

**{¶19}** Z.W. was removed from the Morton's home in February of 2019 for ongoing behavioral issues and placed with Lora Beamer in March of 2019. Beamer lived closer to Appellant at this time.

**{¶20}** Appellant's mother attempted to have a home safety audit to attempt placement of Z.W. with Appellant's mother. However, Appellant's mother never followed through as her attorney advised her not to go through with it at that time.

**{¶21}** On March 19, 2019, Appellant had a second child.

**{¶22}** The Agency had a hearing where G.W. admitted he was abusing Percocets.

**{¶23}** In May of 2019, Tuscarawas County ordered a hair follicle test. G.W. tested positive for THC and methamphetamines. Appellant refused the test, stating it was against her religion to cut her hair. A refusal to take a drug test is considered a positive, and Appellant's visitation through Tuscarawas County was terminated. However, Appellant's visitation through Coshocton County was still occurring.

**{¶24}** On June 23, 2019, the case plan was amended to remove G.W. for his non-compliance.

**{¶25}** Next, Natalie Kolb testified she was employed at the Agency and took over duties of ongoing caseworker for Z.W. when Distelhorst changed positions in August of 2019. At the time Kolb assumed the ongoing caseworker role, Appellant was employed, living with her mother, and completed her behavioral assessments.

**{¶26}** During Kolb's first home visit, Appellant was lying in her room and said she had been ill. Appellant believed her C-section scar was infected and implied that she was pregnant.

**{¶27}** Appellant became inconsistent with her drug screens, only taking them when the Agency could get in touch with her. In November she missed a visit with Z.W., which was a no-call, no-show visit.

**{¶28}** In December of 2019, Appellant took a drug test that day. She tested negative for controlled substances, but the test disclosed that Appellant was pregnant. After this, Appellant started missing visits with Z.W. and stopped her mental health counseling. Appellant did attend her parenting classes in Tuscarawas County, but was not successfully discharged from the program due to the lack of coursework she completed.

**{¶29}** In January of 2020, Tuscarawas County was granted permanent custody of Appellant's second child because of a domestic violence incident reported to law enforcement. Appellant and G.W. were living together when an argument started. Mr. Belt, G.W.'s mother's husband, tried to get them to stop, but then G.W. attacked Appellant. Belt stepped in to stop the attack, and G.W. threw Belt through a window.

**{¶30}** Appellant missed her February visit with Z.W.

**{¶31}** During her March visitation, Appellant had sores on her skin and a green tint to her skin. Appellant, while pregnant at the March visit, tested positive for methamphetamine, amphetamines, and fentanyl. A week later she gave birth to her third child. The Agency turned the baby over to Tuscarawas County Juvenile and Family Services custody. At this point, Appellant stopped contacting the Agency.

**{¶32}** In June of 2020, Appellant was drug screened at her reunification hearing with her third child and tested positive for methamphetamines and amphetamines.

{¶33} On June 10, 2020, G.W. and Appellant overdosed and had to be brought back to life with several doses of Narcan.

{¶34} Appellant's only contact with the Agency since March of 2020, was a voice mail on August 31, 2020, stating she was receiving services at Spero Health in Zanesville, but Appellant could not be reached to sign a release to confirm treatment.

{¶35} The Agency has attempted numerous times to establish contact with Appellant since March but has been unable to establish contact.

{¶36} Z.W. was moved to be placed with the Young family. At the time of placement, King was not available for placement as a foster home, nor did she make herself known as a potential kinship home.

{¶37} Z.W. has stated she is happy with the Youngs but has not verbalized that she wants to live there.

{¶38} Kolb testified that had G.W. and Appellant completed the case plan, reunification would have been possible, and that Z.W. will positively benefit from adoption.

{¶39} The week of the hearing, King contacted the Agency. Kolb was told that King did not have an open home at the time of Z.W.'s last placement. The Agency did not confirm with King if she had changed her mind regarding kinship placement.

{¶40} Next, Denise Nelson testified she works for the Agency in the intake unit, trained in interviews with sexual abuse victims. Nelson interviewed Z.W. about an allegation of sexual abuse. Z.W. arrived at the Agency and was frantic, clinging to her foster parent, Lora Beamer, afraid Appellant was at the Agency. When Nelson was able to interview Z.W., Z.W. stated she was sexually abused by Beamer's fourteen year-old

son. This investigation was turned over to law enforcement and was still open at the time of the hearing.

**{¶41}** Next, Dr. Gary Wolfgang testified he is a licensed psychologist and licensed clinical counselor for the Agency. He testified he met with Appellant but had no contact with G.W. Dr. Wolfgang expressed that Appellant had multiple manifestations of mental and emotional disorders, he had concerns over drug use, concerns of her relationship with G.W., he heard allegations of not taking her child to the doctor when the child was sick, that Appellant and G.W. were evicted, and that Appellant stored pills in Z.W.'s sock which was found on the floor.

**{¶42}** Appellant had been found with a kitchen knife and exhibiting delusional symptoms. Appellant tested positive for Methamphetamines in March of 2018. During her first interview, she was very chatty but disjointed. Her thoughts were not aligned, and she would interrupt an answer to go into an angry speech about various wrongs that had been done to her by extended family, in-laws, or the Agency.

**{¶43}** She blamed her drug use of opiates on attempting to dull pain and use of methamphetamines to stay awake. She eventually claimed ownership of pills found in her bag, though she initially said G.W.'s mother planted them there to get her in trouble.

**{¶44}** In January of 2020, when Dr. Wolfgang interviewed Appellant, Appellant was seven months pregnant. Appellant reported she had not started medical care until she was already four months pregnant. She stated she used drugs, mostly methamphetamines, throughout this period to varying levels of intensity.

**{¶45}** Z.W. had speech and developmental displays which were of some concern. Appellant did not believe it was due to Appellant's drug use.

**{¶46}** Appellant began mental health treatment in the spring of 2018. She missed a number of appointments and then stopped going altogether a few months later. While she was in treatment she was medicated, but she unilaterally stopped her medication. After she stopped her medication, she reported having "brain zaps." She also has numerous symptoms of mania and hypomania and has a history of methamphetamine use. Her reaction after dropping her meds could not be attributed specifically to any one of these habits.

**{¶47}** Next, John Turley testified he is employed by the Coshocton Behavioral Health Choices as a social worker for over five years. Turley completed Appellant's behavioral health assessment on December 12, 2018. The assessment was designed to gather background information on Appellant to evaluate Appellant's needs. Turley recommended individual counseling and drug screens.

**{¶48}** Appellant partially complied with the recommendations. She attended eight appointments and missed four. She completed fifteen drug screens testing positive for benzodiazepines once. She did not produce a prescription for benzodiazepines.

**{¶49}** Jeanette Moll then testified she is guardian ad litem for the Common Pleas Court of Coshocton County, Juvenile Division. Moll is the guardian ad litem for Z.W. Moll testified G.W. had not attempted at all to work the case plan. Moll continued that Appellant had tried to work the case plan in the beginning but had since given up.

**{¶50}** Moll is unaware of any appropriate kinship placement available. Moll believes neither parent is able to provide an adequate and permanent home for Z.W. Z.W. is in need of legally secure and permanent placement with the Agency.

**{¶51}** Next, Angela King testified that she is a certified foster-to-adopt parent in Franklin County. Z.W. is King's goddaughter.

**{¶52}** In January of 2019, King contacted the Agency to attempt to get Z.W. placed as a foster child in her home. At the time King was in between jobs and was unable to agree to kinship care.

**{¶53}** When Z.W. was being moved from the Beamer residence, King reached out to try and get Z.W. placed in her home. King offered to take Z.W. under foster care, but the Agency refused because they were looking for permanent placement. While testifying, King expressed her willingness to commit to long term placement for Z.W.

**{¶54}** King produced a letter of recommendation from Roberta White, the foster networks therapist, recommending King as a foster parent.

**{¶55}** Under cross-examination, King testified she was under investigation by Child Protective Services, but was cleared of the allegation her home was unsafe. King is in regular contact with Appellant's mother.

**{¶56}** Appellant then testified she is currently living with her mother, and that she no longer has a romantic relationship with G.W. She further testified that her visitations with Z.W. were very good into 2019, and that Z.W. was excited to see her.

**{¶57}** After Appellant's third child was born, Appellant says the drug screen had her name spelled wrong, and that it couldn't have been her drug screen. Appellant continued that three days later she had a clean drug screen from a different doctor. As a result of the positive drug screen, Appellant's visitations with Z.W. were discontinued. Appellant also testified that she did not miss the appointments, but that the Agency

canceled them because of COVID and the guardian ad litem's recommendation because of her positive drug screen.

**{¶58}** Appellant then states the report that she and G.W. overdosed in a car and had to receive Narcan was false, that she never received Narcan. She said she was with G.W. when he overdosed. They were on the way to Dollar General and G.W. overdosed. Police knocked on Appellant's window, and she rolled down the window to speak with them. G.W. was unconscious, slumped over the steering wheel. Officers removed G.W. from the car and administered Narcan.

**{¶59}** Appellant then expressed her desire for Z.W. to be placed with Angela King. King is a certified foster parent, and Appellant believes King will be able to raise Z.W. until she is eighteen, that she has a job and can provide stability for Z.W.

**{¶60}** On cross-examination, Appellant said she was not involved in any domestic violence incidents, that she did not take any drugs, nor call for help when G.W. overdosed, and if she were drug screened on the date of the hearing she would probably test positive for benzodiazepines.

**{¶61}** On April 1, 2021, the trial court issued a judgment entry granting Appellee's Motion for Permanent Custody and placing Z.W. into permanent custody of the Agency.

## ASSIGNMENT OF ERROR

**{¶62}** Thereafter, Appellant timely filed her notice of appeal. She raises the following Assignment of Error:

**{¶63}** "I. THE TRIAL COURT'S JUDGMENT WAS AN ABUSE OF DISCRETION.

**I.**

**{¶64}** In Appellant's first Assignment of Error, Appellant argues the trial court abused its discretion by not placing Z.W. with King as a kinship placement. We disagree.

**{¶65}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. §2151.414(B)(1). Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477, 120 N.E.2d 118. If some competent, credible evidence going to all essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶66}** Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal vs. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 1997-Ohio-260, 674 N.E.2d 1159.

**{¶67}** This Court set forth a trial court's analysis of a permanent custody motion in *In the Matters of: A.R., B.R., W.R.*, 5th Dist. Stark Nos. 2018CA00091, 2018CA00097, 2018CA00098, 2019-Ohio-389. When deciding a motion for permanent custody a trial court must follow guidelines provided in R.C. §2151.414. R.C. §2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶68}** R.C. §2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and no relatives of the child are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children's services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period.

**{¶69}** Therefore, R.C. §2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. §2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**{¶70}** In the case *sub judice*, the trial court found they granted the Agency Emergency Temporary Custody of the Child on October 17, 2018 satisfying R.C. §2151.414(B)(1)(d) as Z.W. has been in the custody of the Agency for longer than twelve (12) of the last twenty-two (22) consecutive months. Pursuant to R.C. §2151.414(B)(1)(a), the trial court also found Z.W. could not be placed with either of the parents within a reasonable time or should not be placed with Z.W.'s parents.

**{¶71}** In making this decision, the trial court must consider the factors of R.C. §2151.414(E), which states, in relevant part:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence at a hearing held pursuant to division (A) of this section or for purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have

substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

***

(16) Any other factor the court considers relevant.

**{¶72}** In determining whether the child can be placed with either parent within a reasonable time, the court stated that it had considered all relevant evidence and all factors specifically enumerated in R.C. §2151.414(E). Based on the testimony presented, the trial court found that the minor child had been in temporary custody of the Agency for more than twelve months out of a consecutive twenty-two month period.

**{¶73}** The trial court further found that efforts made by the Agency to work with the parents of Z.W. have been reasonable and appropriate and were consistent with Z.W.'s best interest. The Agency used reasonable efforts to prevent the removal of Z.W. from the home, to remedy the conditions that led to removal of Z.W., and to make it possible for Z.W. to return home. Specifically, the trial court found these reasonable efforts based on the following actions taken by the Agency: facilitation of visits with Appellant, foster placement, and case planning for both G.W. and Appellant.

**{¶74}** "The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children*, 5th Dist. No. 2000CA0024, 2000 WL 1700073 (Nov. 13, 2000), *citing In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

**{¶75}** In determining the best interest of the child at a permanent custody hearing, R.C. §2151.414(D)(1) requires the trial court must consider all relevant factors, including, but not limited to the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, or the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶76} No one element is given greater weight or heightened significance. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816.

**{¶77}** "A child's best interest are served by the child being placed in a permanent situation that fosters growth, stability, and security. *In re P.S.*, 5th Dist. Licking No. 16-CA-11, 2016-Ohio-3489, ¶57. A relative's willingness to care for the child does not alter the court's considerations in deciding permanent custody. *Id.* As such, a trial court need not consider placing a child with a relative prior to granting permanent custody to an agency. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532.

**{¶78}** In *In re Schaefer*, the Supreme Court of the State of Ohio clarified a trial court's duty does not include finding by clear and convincing evidence that no suitable relative was available for placement. *Id.* "The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id* at ¶64.

**{¶79}** The trial court's decision indicates it considered the best interest of the child. The trial court concluded the child's need for legally secure placement could not be achieved without awarding permanent custody to the Agency. Upon review of the entire record, it is clear that the record supports the trial court's finding that granting the motion for permanent custody is in the child's best interest.

**{¶80}** Appellant and G.W. exposed Z.W. to the parents' substance abuse, lack of stable housing, domestic violence, and mental health issues. Appellant stored pills in Z.W.'s socks, G.W. overdosed in a vehicle, having to receive Narcan, right next to Appellant. Appellant denies overdosing as well, but confirms she never sought help for G.W. G.W. never participated in the Agency's case plan and had to be dropped. Appellant, failed to successfully complete the Agency's case plan. If Z.W. is returned to

Appellant or G.W., Z.W. is at risk for abuse and neglect. Z.W. has established a significant bond with the foster family. The Agency also explored placing Z.W. with Angela King. King initially expressed interest as a compensated foster provider but was not in a position to provide uncompensated kinship care. King has not had contact with Z.W. since 2018, and did not come forward in a timely manner.

**{¶81}** The guardian ad litem recommended permanent custody be granted to the Agency because Z.W. could not be safely reunited with the parents.

**{¶82}** For the reasons set forth above, we find that the trial court's determination that permanent custody to the Agency was in the children's best interest was based upon competent, credible evidence.

**{¶83}** Appellant's sole Assignment of Error is overruled.

**{¶84}** For the foregoing reasons, the judgment of the Court of Common Pleas, Juvenile Division of Coshocton County, Ohio, is hereby affirmed.

By: Wise, J.

Baldwin, P. J., and

Delaney, J., concur.

JWW/br  0923