**In re AWKAL.**

[Cite as *In re Awkal* (1994), 95 Ohio App.3d 309.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 65481.

Decided June 27, 1994.

*Debra Obed,* for appellee Cuyahoga County Department of Children and Family Services.

*Mike Schaffer,* guardian for appellant Abdul Awkal.

*Patrick S. Corrigan,* guardian *ad litem,* for appellee Zaynab Awkal.

*James A. Draper,* Cuyahoga County Public Defender, and *Therese M. Peters,* Assistant Public Defender, for appellant Abdul Awkal.

DONALD C. NUGENT, Judge.

This is an appeal from a judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, which permanently terminated the parental rights of Abdul Awkal, appellant herein, and granted permanent custody of Zaynab Awkal to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). Mr. Awkal, father of Zaynab, has appealed, setting forth the following assignment of error:

"The trial court erred when it granted the Cuyahoga County Department of Children and Family Services' motion for permanent custody of Zaynab Awkal; instead, the trial court was mandated to order legal custody under R.C. 2151.412(G)(2) and R.C. 2151.412(D)(5)."

The facts that are relevant to the issues raised in this appeal are as follows. On January 7, 1992, appellant fatally shot Latife Awkal, his wife and Zaynab's mother, and shot and killed Zaynab's maternal uncle. Thereafter, the juvenile court issued an order that granted emergency custody and care of Zaynab to CCDCFS.

At a June 17, 1992 adjudicatory hearing, the juvenile court determined that Zaynab was a dependent child. At the conclusion of that hearing, the juvenile court terminated CCDCFS's emergency custody order and issued an order granting temporary custody of Zaynab to CCDCFS.

On January 12, 1993, CCDCFS filed a motion to modify temporary custody to permanent custody.

On February 26, 1993, the court conducted a preliminary hearing on the motion for permanent custody. At the hearing, appellant, who was represented by counsel, stipulated to the following:

"1. The mother of child is deceased, having died on January 7, 1992.

"2. The father of child has been convicted of aggravated murder and has been sentenced to death. (Cuyahoga County Common Pleas case No. 276801)."

On March 22, 1993, attorney Patrick Corrigan, guardian *ad litem* for Zaynab, made a preliminary recommendation to the juvenile court that the best interests of Zaynab would be served by having her reside permanently with her maternal uncle and his wife, Amer and Mirvat Abdul–Aziz. Corrigan said he had visited with Zaynab in the home of Amer and Mirvat Abdul–Aziz on four separate occasions and that at each visit, Zaynab was playful and appeared healthy and well kept. Corrigan reserved making a final recommendation until the close of the adjudicatory hearing on the motion for permanent custody.

On March 23, 1993, an adjudicatory hearing was held on the motion for permanent custody. Appellant was present at the hearing, although he did not testify. The following evidence was adduced at the hearing.

Amer Abdul–Aziz, Zaynab's maternal uncle, testified that Zaynab had been living with him, his wife Mirvat, and their son since January 9, 1992. Until approximately January 1993, they lived in a double house in the city of Cleveland. Throughout this time, his parents lived above them and his mother helped care for Zaynab. In August 1992, Amer, Mirvat and their son went to Lebanon to care for Mirvat's mother, who was suffering from cancer. Amer returned to the

United States alone approximately one month later. During this one-month period when Amer and Mirvat were both in Lebanon, Amer's brother Ali and his wife Mona cared for Zaynab.

In December 1992, Amer and Zaynab went together to Lebanon, where Mirvat was due to have a baby. When Amer and Zaynab returned to Cleveland in February 1993, they moved in with Ali, Mona and their four children in Strongsville, Ohio. Amer explained that Mirvat could not yet return to the United States because of medical complications of her pregnancy and visa problems with their newborn baby. Although Amer could not provide a date when Mirvat would return, he indicated that government officials said it would not be much longer.

Amer testified that he had no intention of moving back to Lebanon on a permanent basis, as his business interests were in the United States, and that he had no financial problems caring for Zaynab. Amer further testified that he thought of Zaynab as his own biological child and that he wanted to legalize their relationship by adopting her.

Ali Abdul–Aziz testified that from the time Zaynab was placed with his brother Amer in January 1992, he had had almost daily contact with her. Ali said Zaynab had no problem adjusting to living with Amer and Mirvat. Ali further stated that even though Amer and Zaynab were currently living with him, his wife Mona, and their four children, Amer was Zaynab's primary provider of care. Amer took care of Zaynab on weekends, evenings, and during the day on the days Mona worked outside the home. Ali said that Amer also took care of his four children on the days Mona worked. Amer took Zaynab to the doctor's office when she was ill and provided for her other needs. Ali stated that it was in Zaynab's best interests that she be adopted by Amer and Mirvat.

CCDCFS social worker Mary Ann Fox testified that in February 1992, she was assigned to Zaynab's case. Fox said she had observed Zaynab's interaction with Amer and Mirvat Abdul–Aziz and was of the impression that Zaynab was content and fit right into the family unit. It was Fox's opinion that Amer and Mirvat were very committed to raising Zaynab until she reached majority, as well as beyond. Fox further expressed the opinion that it was in the best interests of Zaynab that she be adopted by Amer and Mirvat. Fox also testified concerning Zaynab's relationship with her paternal aunt and uncle, Ali and Mirvat Awkal, and her paternal grandparents. Although Fox was not considering paternal relatives for placement or adoption at this point, she indicated that the visitation rights of Zaynab's paternal relatives were an issue she addressed in the motion for permanent custody. Fox explained that if the motion for permanent custody were granted, the paternal relatives would most likely be cut off from Zaynab unless the material relatives she was permanently placed with chose to preserve

Zaynab's ties to her paternal relatives. Fox said that paternal relatives had had visitation with Zaynab on the following dates since temporary custody was granted to CCDCFS in June 1992: July 12, 1992; August 16, 1992; September 27, 1992; and November 29, 1992. They had also requested visitation on December 30, 1992, but Zaynab was in Lebanon. Fox said she had called the paternal relatives when Zaynab returned from Lebanon and offered visitation on February 11, 17, and 18, which was declined. Fox also testified that the paternal relatives had refused her request that they schedule an appointment with Dr. Neuhaus of the Juvenile Court Diagnostic Clinic.

Upon cross-examination, Fox said she had never interviewed appellant because, under the circumstances of this case, reunification between appellant and Zaynab would never occur. Fox further stated that CCDCFS was moving for permanent custody rather than legal custody of Zaynab to secure prompt permanent placement through adoption by a maternal relative. Fox explained that Zaynab could not be adopted unless CCDCFS had permanent custody of her.

Dr. Steven Neuhaus, an expert in child psychology employed by the Cuyahoga County Juvenile Court, testified that he had had several opportunities to interview Zaynab in the company of Amer, Ali and Mona Abdul–Aziz. In Neuhaus's opinion, Zaynab's mental and cognitive development was on par with other children of her age and in some areas was more advanced. Neuhaus said Amer was Zaynab's primary care provider, but his extended family also partook in her care, which was a positive force in Zaynab's development. Neuhaus expressed the opinion that these multiple care providers might help counter some of the anxiety she experiences as a result of the shooting incident, evidenced by her reaction to loud noises and violence on television.

With regard to permanent custody versus legal custody, Neuhaus expressed the opinion that permanent custody was in Zaynab's best interest so that the adoption by Amer and Mirvat could take place. He stated that adoption would give the family a sense of permanence and allow them to move on without interference. He further stated that, psychologically, Zaynab needed a mother and a father rather than an aunt and an uncle. Finally, Neuhaus opined that Zaynab would benefit from an adoption by Amer and Mirvat.

On cross-examination, Neuhaus testified that he did not see any problems in Zaynab as a result of her having lived in multiple locations or having been cared for by different relatives while she was in the temporary custody of CCDCFS.

Over objection, Ruth Lowery, an employee of Cuyahoga County's Family Conciliation Service, and Cuyahoga County Deputy Sheriff Henry Van Dame testified concerning the events surrounding the shooting death of Zaynab's mother. Deputy Van Dame stated that while on duty at the Lakeside Court House, he observed appellant run down the hall, stop at an elevator, and point his

gun at Zaynab's head. Deputy Van Dame shot appellant, who then dropped Zaynab.

On appellant's behalf, Richard Graham, director of legal services for the juvenile court, testified as an expert regarding the differences between legal and permanent custody. Graham explained that whereas permanent custody permanently terminates all parental rights in giving custody to a public or private care agency, legal custody involves residual parental rights. Graham further explained that the main purpose of a custody order is to provide a child with a permanent, legal, safe, and secure environment. Graham then explained that under an order of legal custody, the court retained continuing jurisdiction over a child until he or she reached the age of majority, meaning that any dispute concerning the child could be brought before the court. Graham said the court did not retain such continuing jurisdiction when permanent custody was ordered and the child adopted.

At the close of all the evidence, attorney Colleen O'Toole was permitted by the court to read aloud a letter from Zaynab's paternal uncle, Ali Awkal. In a very brief letter, Ali Awkal asked the court to consider placing Zaynab with him and his wife, who live in Michigan. Ali Awkal explained that he could not attend the hearing because he had to work, and his wife could not attend because she was caring for their infant child.

Corrigan then recommended to the court that CCDCFS's motion for permanent custody be granted on the basis of the evidence, especially the testimony of Dr. Neuhaus. Corrigan also expressed a desire to avoid forcing family conflicts into Zaynab's life, which he believed would occur if the motion for permanent custody were not granted.

On April 1, 1993, the dispositional hearing was held and, on April 6, 1993, a judgment entry was filed in which the juvenile court granted permanent custody of Zaynab to CCDCFS so that she could be adopted by suitable relatives.

I

Appellant's sole assignment of error challenges the trial court's determination that an order of permanent custody was in Zaynab's best interests. Appellant argues that a secure placement could have been achieved without terminating his parental rights, privileges and responsibilities.[1]

---

1. R.C. 2151.011(B)(10), (11) and (12) set forth the statutory definitions of "legal custody," "residual parental rights, privileges and responsibilities" and "permanent custody" as follows:

"(B)(10) 'Legal custody' means a legal status which vests in the custodian the right to have physical care and control of the child and to determine where and with whom he shall live, and the right and duty to protect, train, and discipline him and to provide him with food,

 A parent's right to raise his or her children is an essential and basic civil right. *In re Murray* (1990), 52 Ohio St.3d 155, 556 N.E.2d 1169, citing *Stanley v. Illinois* (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. Parents have a fundamental liberty interest in the care, custody and management of a child. *In re Murray, supra,* citing *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. However, the rights and interests of natural parents are not absolute.

 R.C. 2151.413 permits a public children services agency that has had temporary custody of a child for at least six months to file a motion requesting permanent custody of a child.

 R.C. 2151.414(B) provides that a court may grant a motion for permanent custody if the court determines, by clear and convincing evidence,[2] that (1) permanent custody is in the best interest of the child and (2) the child cannot be placed with either of his parents within a reasonable period of time or the child should not be placed with his parents. Both the best-interest determination and the determination that the child cannot be placed with either parent focus on the child, not the parent. R.C. 2151.414(C) prohibits the court from considering the effect the granting of permanent custody to a children services agency would have upon the parents.

---

shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities. An individual granted legal custody shall exercise rights and responsibilities personally unless otherwise authorized by any section of the Revised Code or by the court.

"(11) 'Residual parental rights, privileges, and responsibilities' means those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including but not necessarily limited to the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support.

"(12) 'Permanent custody' means a legal status which vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, including the rights to consent to the adoption, and divests the natural parents or adoptive parents of any and all parental rights, privileges, and obligations, including all residual rights and obligations."

2. "Clear and convincing evidence" is defined as "[t]hat measure or degree of proof which is more than a mere 'preponderance of evidence' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Lansdowne v. Beacon Journal Publishing Co.* (1987), 32 Ohio St.3d 176, 180–181, 512 N.E.2d 979, 984, citing *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

1 Ohio Jury Instructions (1993) 115, Section 3.75, sets forth the following instruction on clear and convincing evidence, drawn from *Lansdowne, supra:*

"1. CLEAR AND CONVINCING. To be 'clear and convincing' the evidence must have more than simply a greater weight than the evidence opposed to it and must produce in your minds a firm belief or conviction about (the facts to be proved) (the truth of the matter)."

Appellant does not dispute that CCDCFS established by clear and convincing evidence that Zaynab cannot be placed with either of her parents within a reasonable time or should not be placed with her parents. Rather, appellant contends that an order of permanent custody was not in Zaynab's best interest.

In determining whether permanent custody is in the best interest of a child, R.C. 2151.414(D) requires the juvenile court judge to consider *all factors that are relevant to the best interests of the child,* including, but not limited to:

"(1) The reasonable probability of the child being adopted, whether an adoptive placement would positively benefit the child, and whether a grant of permanent custody would facilitate an adoption,

"(2) The interaction and interrelationship of the child with his parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child:

"(3) The wishes of the child * * *;

"(4) The custodial history of the child;

"(5) *The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.*" (Emphasis added.)

 R.C. 2151.414(D) is written broadly and requires the juvenile court judge to consider all factors that are relevant to the best interests of the child. The purpose of a far-reaching inquiry is to allow the judge to make a fully informed decision on an issue as important as whether to terminate parental rights, privileges and responsibilities. The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. Moreover, the knowledge the juvenile court gains at the adjudicatory hearing through viewing the witnesses and observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony cannot be conveyed to a reviewing court by a printed record. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1276; cf. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 523 N.E.2d 846. Hence, this reviewing court will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable or capricious. See *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142 (defining "abuse of discretion").

It is against this standard of broad discretion that we must review the sufficiency and weight of the evidence to support the juvenile court's determination that an order of permanent custody is in the best interest of Zaynab.

We turn now to appellant's specific contention that a legally secure permanent placement could have been achieved without a grant of permanent custody to CCDCFS. In the May 6, 1993 journal entry, the juvenile court judge specifically addressed appellant's contention that a secure placement could have been achieved without granting permanent custody. In this regard, the court opined as follows:

"Abdul Awkal resists permanent custody for Zaynab. He argues that an order of legal custody to a relative is 'a legally secure permanent placement.' It is not, however, a legally secure permanent placement for a child who is not an orphan. If legal custody is ordered instead of permanent custody, Abdul Awkal's residual parental rights would continue to be a platform from which he may legally challenge Zaynab's placement for as long as he lives. It could be ten years before the courts finally resolve the legal agonies associated with the imposition of the capital penalty in the case of Abdul Awkal.

"*To grant the request of Abdul Awkal in this case would ignore the thrust of a long line of well-reasoned court decisions, the weight of child psychology opinion and the legislative mandate of the statutes enacted by S.B. 89, effective January 1, 1989, that:*

"1) Abused, neglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term;

"2) Abused, neglected and dependent children need not be required to languish in legally insecure placements for two, three, four or more years while natural parents are either unwilling or unable to correct serious parenting deficiencies; and

"3) The best interest of the child is the pivotal factor in permanency cases.

"S.B. was the Emancipation Proclomation [*sic*] for Ohio's abused, neglected and dependent children. No longer were these innocents to be considered mere legal appendages of their parents.

"It may be important to note that the best interest of Zaynab prevails over any lingering remnants of the ancient law of paterfamilias, under which a father exercised complete dominion over his child. No one exercises dominion over Zaynab. The court believes that it is Zaynab's inherent right to be treated as a unique, separate human being, rather than as the mere legal appendage of Abdul Awkal." (Emphasis added.)

In reaching its conclusion, the court specifically noted the expert testimony of psychologist Dr. Neuhaus, who expressed the opinion that permanent custody was in Zaynab's best interest so that the adoption by Amer and Mirvat could take place. He stated that adoption would give Zaynab and the Abdul–Aziz family a sense of permanence and allow them to move on without interference. He further stated that, psychologically, Zaynab needed a mother and a father rather than an aunt and an uncle.

In addition to the opinion of Neuhaus, Fox also testified that an order of permanent custody rather than legal custody was in Zaynab's best interests so she could be adopted by Amer and Mirvat Abdul–Aziz. Corrigan similarly recommended to the court that the motion for permanent custody be granted. Corrigan made this recommendation based on his observations of Zaynab with Amer and Mirvat and the hearing testimony of Neuhaus. Corrigan also believed that an order of permanent custody would avoid forcing family conflicts into Zaynab's life.

Upon review of all the evidence that was before the trial court, as summarized above, and each of the factors set forth in R.C. 2151.414, this court finds that the standard of proof required by R.C. 2151.414 has been met. There being competent, credible evidence to uphold the trial court's finding, this court will not disturb such finding as an abuse of discretion.

Appellant also challenges CCDCFS's case plan, which listed as its goal the adoption of Zaynab, as defective under R.C. 2151.412(G),[3] which appellant con-

---

3. R.C. 2151.412(G) provides, in relevant part, as follows:
 "(G) In the agency's development of a case plan and the court's review of the case plan, the agency and the court shall be guided by the following general priorities:
 " * * *
 "(2) If both parents of the child have abandoned the child, have relinquished custody of the child, have become incapable of supporting or caring for the child even with reasonable assistance, or have a detrimental effect on the health, safety, and best interest of the child, the child should be placed in the legal custody of a suitable member of the child's extended family.
 "(3) If a child described in division (G)(2) of this section has no suitable member of his extended family to accept legal custody, the child should be placed in the legal custody of a suitable nonrelative who shall be made a party to the proceedings after being given legal custody of the child;
 "(4) If the child has no suitable member of his extended family to accept legal custody of the child and no suitable nonrelative is available to accept legal custody of the child and, if the child temporarily cannot or should not be placed with his parents, guardian, or custodian, the child should be placed in the temporary custody of a public children services agency or a private child placing agency;
 "(5) If the child cannot be placed with either of his parents within a reasonable period of time or should not be placed with either, if no suitable member of the child's extended family or suitable nonrelative is available to accept legal custody of the child, and if the agency has a reasonable expectation of placing the child for adoption, the child should be committed to the permanent custody of the public children services agency or private child placing agency."

tends mandates that CCDCFS move for legal custody rather than permanent custody when there is a suitable relative with whom the child can be placed. Our review of the record reveals that appellant failed to object to the case plan at the trial level. It is axiomatic that errors not presented for consideration to the trial court will not be considered by this court on appeal. See *Shover v. Cordis Corp.* (1991), 61 Ohio St.3d 213, 220, 574 N.E.2d 457, 462. As a result, appellant has waived his claim that the case plan was defective.

In light of all of the foregoing, we find that the juvenile court did not abuse its discretion in granting permanent custody of Zaynab to CCDCFS. Accordingly, appellant's sole assignment of error is overruled, and we affirm the judgment of the juvenile court.

*Judgment affirmed.*

HARPER, P.J., and DYKE, J., concur.