[Cite as *In re A.M.*, 2019-Ohio-4466.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE A.M.

A Minor Child

[Appeal By R.M., Mother]

:
:
:
:
:

No. 108405

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 31, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-18903215

---

*Appearances:*

Christina M. Joliat, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Laura M. Brewster, Assistant Prosecuting Attorney, *for appellees.*

ANITA LASTER MAYS, J.:

{¶ 1} Appellant R.M., mother of minor child A.M., appeals the juvenile court's award of permanent custody to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). As required by App.R. 11.1(D), this court has expedited the hearing and disposition of this appeal. We affirm.

## I.     History and Facts

{¶ 2}   A.M. was born in August 2015, to R.M. (hereinafter referred to as "Mother") and father C.M. (hereinafter referred to as "Father").  Mother tested positive for cocaine during the pregnancy and suffered from mental health issues.  Father also suffered from substance abuse issues.  CCDCFS became involved with the family at A.M.'s birth but was already familiar with Mother whose three other children were removed from her custody due to substance abuse.[1]

{¶ 3}   The agency requested protective supervision of A.M. in November 2016, but an event transpired that triggered a filing for emergency temporary custody to CCDCFS.  On April 18, 2017, A.M. was adjudicated to be a neglected and dependent child under R.C. 2151.03(A)(2) and 2151.04(D) and was committed to the agency's temporary custody due to Mother's substance abuse issues.  A.M. was placed with foster parents and reunited with Mother in December 2017 with an order of protective supervision by the agency.

{¶ 4}   Mother relapsed again and in March 2018, A.M. was returned to the foster parents.  On March 9, 2018, CCDCFS filed a complaint for neglect, dependency, and permanent custody of A.M. pursuant to R.C. 2151.03(A)(2) and 2151.04(D).  On March 12, 2018, CCDCFS moved for predispositional temporary custody of then two-year-old A.M. and requested a full hearing.  The agency argued that A.M. was in immediate danger from his surroundings, and that removal was necessary to prevent immediate or threatened physical or emotional harm.

---

[1]  A.M.'s younger sibling, born in 2016, was voluntarily placed for adoption.

{¶ 5} At the March 12, 2018 hearing for predispositional temporary emergency custody of A.M., Mother and CCDCFS, the only attendees, appeared with counsel. Mother stipulated to a finding of probable cause and denied the complaint allegations. On April 3, 2018, the trial court granted emergency temporary custody.

{¶ 6} On August 22, 2018, an amended complaint for neglect, dependency, and permanent custody of A.M., a neglected child under R.C. 2151.03(A)(2) and 2151.04(D) was filed. At the hearing, Mother admitted to the amendments and the trial court determined for the second time that A.M. was neglected and dependent.

{¶ 7} Father filed a motion for legal custody on October 17, 2018, one week before the full custody hearing on October 24, 2018.

## A. October 24, 2019 Dispositional Hearing

### 1. Social Worker

{¶ 8} CCDCFS social worker Tracy Digney ("Digney") has handled A.M.'s case since the birth. The agency was contacted by the hospital because Mother tested positive for cocaine during the pregnancy.

{¶ 9} Digney met with Mother and Father at the hospital. Father is the biological father of A.M. and Mother's other children. The couple had been married for more than 15 years and divorced in 2017. Digney allowed A.M. to remain with Mother who was living in sober housing and participating in counseling, drug abuse programs, and drug court. Father was living separately and was involved in sobriety support for his substance abuse issues.

{¶ 10} The couple relapsed in fall of 2015 and failed to comply with the agency's random drug screen requests during the summer of 2016 though Mother continued to participate in substance abuse and mental health counseling. Mother and Father, who had a history of physical altercations, began living together again in 2016. In November 2016, the trial court granted the agency's request for protective supervision of A.M. after an October 2016 domestic violence incident that resulted in a guilty plea by Father.

{¶ 11} A.M. was not removed from the home because of Mother's continued participation in counseling and treatment. However, in February 2017, Mother left A.M. with a friend at Mother's apartment. The friend left A.M. with a third-party when Mother could not be located. Police notified CCDCFS. Father was incarcerated and there were no relatives to care for A.M. CCDCFS placed A.M. in foster care with foster parents K.H. and L.H.

{¶ 12} Mother reentered treatment at the hospital treatment program that she had just completed. Mother developed a good relationship with the foster parents and A.M. was reunified with Mother in December 2017. Mother missed several agency and counseling appointments and admitted to a relapse in February 2018. Since A.M. appeared to be well-cared for, CCDCFS opted to involve the drug court and allowed A.M. to remain with Mother. The protective supervision order was still in effect.

{¶ 13} In March 2018, Mother left A.M. in their apartment with a sleeping boyfriend while she went to purchase crack cocaine. Mother did not return, and the

boyfriend left A.M. in the apartment. A.M. found his way to a neighbor's apartment who called the police. The agency's 696-KIDS children's protection hotline was contacted. Mother pleaded guilty to endangering children and to a grand theft charge for taking the boyfriend's vehicle without permission.

{¶ 14} The agency filed a complaint for neglect, dependency, and permanent custody in March 2018 and A.M. was returned to the foster couple. CCDCFS requested that Mother contact her father, brother, and sister to assume custody of A.M., but Mother's father advised the agency that there was no one to care for A.M. Mother was still engaged in drug and mental health counseling and was still engaged in the hospital counseling program at the time of the custody hearing.

{¶ 15} Digney testified that Mother continues to struggle with substance abuse. Mother admitted to using crack cocaine as recently as May 21, 2018, during her last positive drug screen, but Mother declined to submit to a hair analysis. Mother also failed to attend an October 2, 2018 screening but later appeared on October 10, 2018. To complete her case plan, Mother would need to validate that she is drug-free. Digney pointed to the agency's records of Mother's drug abuse issues since 2002 and emphasized that Mother does not have custody of any of her children. Children born to Mother in 2008 and 2016 had tested positive for cocaine at birth.

{¶ 16} The parents have split visitation with A.M. at a neighborhood agency center. Father and A.M. seem to get along well but A.M. whines more with Mother and becomes defiant upon returning to his foster parents, advising that they are not

his real parents.  Father participated in domestic violence counseling during his domestic violence incarceration and subsequent incarceration for violating a civil protection order forbidding contact with Mother 2017.  Father has been involved with the agency since his release and, until a week prior to the hearing when he filed for custody of A.M., supported permanent placement with the agency.  (Tr. 54.)

{¶ 17}  Digney expressed concern about the volatility of Mother and Father's relationship and their history of drug use.  She was also troubled by the confusion created for A.M. by the entire series of events, such as A.M. referring to both Father and Mother's current boyfriend as "dad."  A.M. also exhibits fear and anxiety due to the uncertainty of changing residences and visitation.

{¶ 18}  Digney opined:

> I do feel it's in the best interest for [A.M.] to be in the permanent custody of the Agency.  It's no longer about [Mother]. It's no longer about [Father]. This is a 3-year-old child that has really just been through a lot in his three years of life, and especially going back and forth.
>
> I think he already shows signs of dealing with separation issues.  I know that was a concern when [Mother] did have him back. [A.M.] would be very scared of things due to back and forth with visits and stuff.  He was very frightful of different things.
>
> To have this happen again and to have him come back again if it should happen, the damage could be irreversible for [A.M.].

(Tr. 57-58.)

{¶ 19}  Digney last visited Mother in August 2018 at the home of Mother's father who has custody of one of Mother's older sons.  Mother continues to engage

in drug abuse and mental health counselling. However, Mother still struggles with periodic relapses and Digney has observed Mother's sudden mood swings.

{¶ 20} Digney expressed concern that placing A.M. with Mother at her father's home would not be in the child's best interest. Though A.M.'s basic needs of food and shelter may possibly be met, the presence at the home of Mother's older son caused concern due to his use of alcohol and drugs.

{¶ 21} Mother consistently attends the weekly visits with A.M. and the interaction between them has improved, but Mother babies A.M. during his temper tantrums instead of setting boundaries. Digney also advised that A.M. is more relaxed and congenial at the home of the foster parents and has bonded with them as well as another child the couple is adopting.

{¶ 22} During cross-examination, Digney confirmed that Father has been compliant with his case plan to date, participated in domestic violence counseling and has had negative drug test screens. Earlier in October, Mother told Digney that Father was going to seek custody of A.M. so that Mother could have him. Based on Digney's review of the agency's computer history for Mother, 60 calls had been placed to the 696-KIDS hotline concerning Mother's children from 2001 to the present.

### 2. Foster Parents

{¶ 23} Foster parent L.H. testified that she and her partner reside in a small town near a school, have an 11-year-old biological child and are in the process of adopting another foster child who is one year younger than A.M. and who also

resides with them. A.M. only spoke a few words and seemed rather pale and sickly when he first arrived. He also suffered from diarrhea for several days after supervised visits with Mother who would give him coffee during the encounters. The foster parents developed a positive relationship with A.M. and Mother to prepare him for reunification and personally returned A.M. to Mother.

{¶ 24} The foster parents remained in contact with Mother. In February 2018, the foster parents kept A.M. at their house for the weekend at Mother's request. They had also arranged to pick up A.M. two weeks later but Mother said that A.M. had gone out of town. The foster parents did not hear from Mother after that.

{¶ 25} In March 2018, A.M. was returned to the foster parents who were advised that A.M. had been left alone at home again. A.M. became reluctant to separate from the foster parents and would "throw fits" and run away when drivers arrived to pick him up for visitation with Mother. (Tr. 121.) A.M. is withdrawn, throws tantrums, and is defiant and angry after he returns from visits with Mother and the foster parents have seen little improvement.

{¶ 26} The foster parents are willing to provide a permanent home for A.M. They also agreed that they would allow A.M. to have a relationship with his biological relatives.

### 3. The Guardian Ad Litem

{¶ 27} The guardian ad litem ("GAL") testified that she was assigned to the case in 2015. In December 2017, the GAL recommended reunification with court-

ordered protective supervision because Mother had completed the drug court requirements and the child was doing well.

{¶ 28} The GAL's September 4, 2018 report recommended granting permanent custody to the agency. The change in opinion resulted from Mother's drug relapses as well as visiting the child in the foster home environment where A.M. seemed happier. Mother "relapsed I think once or twice while she had [A.M.] back. * * * I would want to see sobriety for like a year. So that is not in the near future." (Tr. 145-146.) The GAL did not correspond or communicate directly with Mother between March and September 2018, except through drug court pretrials and had not observed A.M. with either parent in 2018. Also, the GAL did not visit Father's home because Father had already agreed that the agency should receive custody and she was not aware of Father's recent legal custody filing.

### 4. Findings

{¶ 29} The trial court determined that CCDCFS presented clear and convincing evidence that A.M. should not be reunited with Mother and recited the foundational events for the decision that dated back to 2015.

> The Court finds that the agency did present clear and convincing evidence that it is not in the best interest of the child to be reunited with the mother. The mother has five other children not in her care. The family has been continuously involved with the [CCDCFS] since February 2015. Both the father and the mother relapsed in the fall of 2015. They both admitted this relapse. Protective Supervision was granted in 2016 due to domestic violence by the father against the mother and because the parents were not cooperating with urine screens.

The child came into custody in February 2017 when the mother could not be located. The father was incarcerated and no relatives were available or able to take the child.

The mother was reunified on December 19th or 20th of 2017. The mother admitted using opium in February 2018 but the child was not removed at that time. The child was removed from the mother a second time [o]n March 9, 2018 when the mother again disappeared. The mother left the baby with a mom who then called 696-KIDS hotline. The child was returned to the foster home. The mother was convicted of felony Grand Theft as a result of what occurred on March 9, 2018. The mother has also been convicted of Child Endangering. The mother admitted to using crack in February, April, and May of 2018, and the weekend the child came into custody the second time.

The father was in agreement with Permanent Custody until the week before trial. The parents were married and he is the father of three children who are also not in his care and custody. The father was incarcerated for over a year of this three-year-old child's life. From 2001 to present there have been 60 calls to the hotline regarding this family.

The Court particularly notes the testimony from the social worker that this three-year-old child has been through a lot and the damage would be irreversible if he were reunified and removed a third time.

Journal entry No. 0911787781 (Nov. 20, 2018).

{¶ 30} The trial court held the prayer for permanent custody in abeyance pending an updated report by the GAL addressing Father's ability to parent, living situation, and his current relationship with Mother. The January 9, 2019 dispositional hearing was continued to allow Father to meet with the social worker and foster parents. The parties subsequently participated in a mediation program at Adoption Network Cleveland.

**B. February 23, 2019 Final Dispositional Hearing**

{¶ 31} The GAL filed an updated report and testified, along with Father, at the final dispositional hearing on February 13, 2019. CCDCFS and Mother's counsel also appeared. Mother did not attend.

**1. GAL**

{¶ 32} The GAL maintained the prior recommendation to award permanent custody to the agency. The GAL observed A.M.'s visit with Father and described it as "appropriate." (Tr. 206.) Concerned about the domestic violence history between Mother and Father, the GAL learned from employees at the visitation location that Mother and Father had attended visits together. A social worker observed Mother's vehicle parked in Father's driveway when passing the residence one evening, and a friend of Father advised the GAL that Mother and Father were still involved. The GAL did not see housing as an issue but did not visit the one-bedroom residence and was not aware of any conflicts between the foster parents and Father.

{¶ 33} The GAL opined that Father seemed to waver about assuming custody of A.M. and appeared to feel pressured.

> Counsel: What conversation did you have with the father? What did you talk to him about?
>
> GAL: About parenting his child.
>
> Counsel: What did [Father] say to you specifically?
>
> GAL: He said that he was wavering back and forth a lot for one. He said that his father and brother, maybe his older son have told him that he should get his son back, and they didn't like the family situation where he was, but he said that he was fine, he likes them.

I just felt that maybe he was being pressured.

Counsel: And when father told you that he was wavering, how did that affect your report which recommended permanent custody?

GAL: Concerned.

Counsel: Would you ever recommend a child go to someone who's wavering on being a parent?

Gal: No. I mean, I was concerned that he's maybe not 100 percent sure that that is what — maybe that's what he wants, but maybe that's not what's best for his child.

(Tr. 209-210.)

### 2. Father

{¶ 34} Father testified that he has a one-bedroom apartment and that he is able to support A.M. on income received from his employment with a nonprofit organization where he has worked since April 2018. Father also works periodically for his brother's tree service and has completed his CCDCFS case plan. Father would place A.M. in daycare while working.

{¶ 35} Father said that he was with A.M. for the first 14 months of his life and that, since his release from incarceration, he has grown closer to A.M. through weekly visits. "[T]he young man's been through a lot." (Tr. 173.) "I'd like to give him someplace stable permanently." *Id.* "It's tough" saying goodbye at visits and "[i]t's great when it's just me and him." (Tr. 174.) "Sometimes when [Mother] shows up, it can be a little chaotic." *Id.*

{¶ 36} According to Father, Mother has a lot of issues and he tried to help her when he could but "a couple of weeks" before the hearing, Father decided he

could no longer help her because it began to "affect my peace and serenity." (Tr. 175.) Father informed the GAL that he would let the courts handle visitation arrangements for Mother if he receives custody. Father believes Mother has outstanding warrants and "absolutely" believes Mother is using drugs again. Father denies that he is still involved with Mother and said that others who saw them together were probably just misled.

{¶ 37} Father confirmed that his other children urged him to obtain custody of A.M. and admitted that he wavered on the issue during the summer. "I wanted to make sure that I wanted him for the right reasons, and I wanted his best interests at heart." (Tr. 182.)

> Counsel: And if the foster parents kept him and they let you have visits, would that be like an ideal situation? You could be a part of his life?
>
> Father: I don't know if it would be ideal, but I don't know if there's any ideal situation concerning this case anymore."

*Id.*

{¶ 38} Father denied that, after his October 2018 urine screen, he failed to submit to agency requests for tests on November 6, 2018 and November 18, 2018, and claimed that he has been sober since his November 16, 2016 incarceration. Father testified that he has completed classes and counseling for anger management, domestic violence, and intensive outpatient treatment. He also submits to drug testing at Cleveland Catholic Charities when asked.

{¶ 39} In response to Father's inquiry whether Ohio recognizes open adoptions, the trial court responded that it would like to see the social workers,

foster parents, and Father "sit down and talk about the case." (Tr. 184.) The trial

court continued,

> And I am very aware of this will be [A.M.'s] third removal if it doesn't
> work out, so I don't want to risk that, but I respect where you're coming
> from, sir.
>
> So I want you guys to sit down and talk about this. I'm sensing some
> ambiguity here, and there's been no opportunity for you guys to talk. I
> want you to talk. I want you to sit down with the social worker and the
> foster parents.

Tr. 185.

{¶ 40} Mother's counsel asked whether Mother would be allowed to

participate in the meeting. The trial court responded:

> No. No. And I'll tell you why. Because if it was just her, I'd grant
> permanent custody [to the agency], and I think I spelled that out, did I
> not, in my [November 2018] journal entry. And I think she would
> introduce a wild card element to this that would be unhelpful.
>
> I'm not gonna — I can't, you know, separate them out. If you want to
> draft it, if you want to brief it why she should be there, go ahead. You
> know, I respect your right to do that, but I'm just telling you, [the
> GAL's] concern, and I share it, is the chaos [that] is introduced here.
>
> You know, your concern was that she's got — and we've already had
> reunification with your client. That's why we're here. This is number
> three now.
>
> So, you know, I remember the foster mother talking about, you know,
> the child on the first time, and then [Mother] was reunified and we
> came back and it changes. No. I don't think that's where we — we're
> not going in that direction.

(Tr. 185-186.)

{¶ 41} Questioned about losing custody of his other children with Mother, Father explained that he is more mature and is now sober. Father was also asked whether he, or his son, have concerns about the suitability of the foster parents.

Counsel: What are your ideas of what a family unit should be?

Father: Two people raising a child that love each other. That's the ideal.

Counsel: What about where [A.M.] is right now?

Father: I think that those women are — it sounds like a great place.

(Tr. 190.) Father suggested that counsel subpoena his son if he wanted additional information.

{¶ 42} Father explained that his protection order violation resulted from sending a letter to Mother about A.M. and his well-being. He served six months "because I didn't follow directions." (Tr. 197.) "There was nothing violent about that letter." *Id.*

{¶ 43} If awarded custody, Father would allow A.M. to visit with the foster parents. "I spent a lot of restless nights in the penitentiary when I knew that [A.M.] was at home with — you know. I slept better once I met [the foster parents]" and "I knew that he was in a safe place." (Tr. 201.)

{¶ 44} Father has continued to engage with Catholic Charities on a voluntary basis. He explained that his drugs of choice have been alcohol and cocaine. Father admitted that he is still an addict because addiction can be in remission but cannot be cured. Father suffered a temporary drop in attendance at Catholic Charities in November 2018. "[I]t's not something that I planned on

attending the rest of my life. I go to Alcoholics Anonymous meetings for that."
(Tr. 204.)

### C. Findings

{¶ 45} On March 6, 2019, the trial court incorporated its prior findings and determined that permanent custody is in the best interest of the child and that the child could not be placed with the parents within a reasonable time. Father has not appealed the trial court's order. We address Mother's timely appeal below.

## II. Assignment of Error

{¶ 46} Mother's single assignment of error charges that the trial court's decision is not based upon sufficiently clear and convincing evidence, is against the manifest weight of the evidence, and erroneously determines that the permanent custody award to the agency is in the best interest of the child.

{¶ 47} Parents have a constitutionally protected, fundamental interest in the management, custody, and care of their children. *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). "We recognize, however, that termination of parental rights is 'the family law equivalent of the death penalty in a criminal case.'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14.

{¶ 48} However, a parent's right to raise a child is not absolute and it is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 8th Dist. Cuyahoga No. 104325,

2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29, quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 49} CCDCFS filed for permanent custody on the ground that A.M. has been declared to be a neglected and dependent child under R.C. 2151.03(A)(2) and R.C. 2151.04(D). A neglected child is one "[w]ho lacks adequate parental care because of the faults or habits of the child's parents, guardian or custodian." R.C. 2151.03(A)(2).

{¶ 50} A dependent child is one

(A)    Who is homeless or destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian;

(B)    Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;

(C)    Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship;

(D)    To whom both of the following apply:

   (1)    The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child.

   (2)    Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household.

{¶ 51} R.C. 2151.353(A)(4) authorizes a trial court to grant permanent custody to the agency where, as in this case, a child has been adjudicated as neglected, dependent, or abused. The trial court must determine by clear and

convincing evidence that: (1) "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" pursuant to R.C. 2151.414(E); and (2) "permanent commitment is in the best interest of the child" pursuant to R.C. 2151.414(D)(1). R.C. 2151.353(A)(4).

## A. Standards of Review

{¶ 52} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re Jacobs*, 11th Dist. Geauga No. 99-G-2231, 2000 Ohio App. LEXIS 3859, *11 (Aug. 25, 2000), citing *In re Taylor*, 11th Dist. Ashtabula No. 97-A-0046, 1999 Ohio App. LEXIS 2620 (June 11, 1999).

{¶ 53} "Clear and convincing evidence" is that measure or degree of proof that is more than a "preponderance of the evidence," but does not rise to the level of certainty required by the "beyond a reasonable doubt" standard in criminal cases. *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 8, citing *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994), citing *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 180-181, 512 N.E.2d 979 (1987). It "produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re M.S.* at ¶ 18.

{¶ 54} "It is well established that when some competent, credible evidence exists to support the judgment rendered by the trial court, an appellate court may not overturn that decision unless it is against the manifest weight of the evidence."

*In re C.T.,* 8th Dist. Cuyahoga No. 87159, 2006-Ohio-1944, ¶ 15, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978).

{¶ 55} Therefore,

> [t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re Satterwhite*, 8th Dist. Cuyahoga No. 77071, 2001-Ohio-4137. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding (i.e., observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record. *Id.*, citing *Trickey v. Trickey,* 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. *Seasons Coal Co., Inc., supra* at 80. As the Supreme Court of Ohio has stated, "it is for the trial court to resolve disputes of fact and weigh the testimony and credibility of the witnesses." *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 550 N.E.2d 178 (1990).

*In re C.T.* at ¶ 15.

{¶ 56} The R.C. 2151.414(D) determination of a child's best interest under the R.C. 2151.414(D) factors "is an application of the court's discretion based upon a nonexclusive list of factors. We review that determination for an abuse of discretion." *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 43. "An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment." *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

### B. Discussion

#### 1. R.C. 2151.414(E) — Placement with Parent within a Reasonable Time

{¶ 57} Mother concedes that A.M. has been in the custody of CCDCFS since March 2018. However, Mother argues that the record does not support the finding by clear and convincing evidence that A.M. cannot be placed with Mother within a reasonable period of time. In support of her position, Mother offers that she has: (1) substantially completed her case-plan objectives, (2) participated in mental health services through a family services agency since 2015; (3) participated in domestic violence counseling; (4) completed substance abuse counseling at hospital program; and (5) has been drug free since May 2018.

{¶ 58} Mother also offers that her current period of sobriety and historical willingness to participate in substance abuse and mental health abatement activities should be equitably balanced against the social worker's concerns of relapse. The record demonstrates that the relapse concerns are empirically supported.

{¶ 59} In the final judgment entry, the trial court incorporated its findings from the November 20, 2018, journal entry and added that it continued the January 9, 2019 to allow completion of the investigation regarding suitability of the Father. The trial court also noted that Father, the social worker and the foster parents "were able to discuss the case through a mediation program at Adoption Network Cleveland." Journal entry No. 091299158 (Mar. 7, 2019), p. 1.

{¶ 60} The trial court determined that R.C. 2151.414(E)(1) applies:

(E)  In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1)  Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

*Id.* at p. 1-2.

{¶ 61} The trial court held,

Pursuant to R.C. 2151.353(A)(4), the Court finds by clear and convincing evidence that the child cannot and should not be placed with either parent for the following reasons in accordance either [sic] Division (E) of Section 2151.414:

(E)(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home.

> The Guardian Ad Litem for the child recommends Permanent Custody as being in the * * * best interest of the child. There is no written motion for Legal Custody to any relative or interested individual.
>
> The Court finds that the child's continued residence in or return to the home would be contrary to the child's best interest and welfare.

*Id.*

**{¶ 62}** The trial court also determined that the agency made "reasonable efforts" at reunification. R.C. 2151.419:

> The Court finds that CCDCFS has made reasonable efforts to prevent placement and/or to make it possible for the child to remain in or return to the home of the mother. The Court finds that CCDCFS has made reasonable efforts to finalize the permanency plan as described at trial. The permanency plan for the child is approved. The case plan is the permanency plan. The permanency goal is adoption.

Journal entry No. 091299158, p. 2. (Mar. 7, 2019). The criminal conviction record of Mother and Father as well as Mother's drug relapses are additional relevant factors under R.C. 2151.414(E)(16).

**{¶ 63}** The trial court concluded:

> It is therefore ordered that the order made committing the child to the Emergency Temporary Custody of CCDCFS is terminated. The parental rights of mother * * * and father * * * are hereby terminated. * * *
>
> The Court finds that the child's continued residence in or return to the home of mother will be contrary to the child's best interest.

*Id.*

**{¶ 64}** The agency engaged in multiple efforts for permanent reunification of A.M. with Mother in spite of Mother's history of chemical dependence. Mother tested positive for cocaine consumption during the pregnancy. Three of Mother's

children had been removed from the home due to the substance abuse issues and custody of a sibling born to Mother less than a year after A.M.'s birth was voluntarily relinquished.

**{¶ 65}** Notwithstanding the questionable history, CCDCFS viewed as factors against removal of A.M. at that time: (1) Mother's participation in substance abuse and mental health counseling; (2) Mother's residency in a sober environment; and (3) that Mother and Father, who suffered from chemical dependency and an abusive relationship history, were not residing together.

**{¶ 66}** A.M.'s first emergency removal due to Mother's substance abuse stemmed from Mother's failure to return after leaving A.M. with a friend so that Mother could secure drugs. Police and agency intervention were required. A.M. was declared neglected and dependent, the agency obtained temporary emergency custody and A.M. was placed in foster care. Mother's relationship with the foster parents and A.M. was developed and nurtured for potential reunification with Mother. Mother participated in drug abuse and mental health counseling. Mother and A.M. were reunited, and CCDCFS maintained protective supervision.

**{¶ 67}** Just a few months after reunification, Mother left A.M. in her apartment with a sleeping boyfriend so that Mother could obtain drugs. The boyfriend left A.M. alone at the apartment and A.M. wandered to the home of a neighbor who contacted the police. Mother pleaded guilty to endangering children and grand theft of the boyfriend's vehicle.

{¶ 68} The foster parent testified that the initially positive relationship with Mother and A.M. deteriorated when A.M. rejoined the foster parents several months later. A.M. was clingy, reacted negatively to being transported for visits with Mother and was irritable and angry after returning from visits. Mother allowed A.M. to visit the foster parents during the first reunification but, during the second reunification, contact eventually ceased. The GAL recommended granting custody to the agency due to Mother's inability to overcome the substance abuse issues. No family members were able to assume custody. Father also testified that Mother was still using drugs and that she has mental health problems. The trial court, social worker, and GAL expressed great concern that a third reunification would be traumatizing for three-year-old A.M.

{¶ 69} We find that the trial court's decision that A.M. could not be placed with Mother within a reasonable time pursuant to R.C. 2151.414(E) is supported by clear and convincing evidence.

## 2. R.C. 2151.414(D)(1) — Best Interests of the Child

{¶ 70} When determining the child's best interest pursuant to R.C. 2151.414(D)(1), courts analyze all relevant factors including: (1) the interaction and interrelationship of the child with others; (2) the wishes of the child expressed directly or through the GAL; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and, (5) whether any of the factors in divisions R.C. 2151.414(E)(7) to (11) apply. *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-

Ohio-827, ¶ 29-34, citing R.C. 2151.414(D)(1). "If even one of the factors exists, the court is mandated to enter a finding that the child cannot or should not be placed with the parents." *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 26, quoting *In re Hauserman*, 8th Dist. Cuyahoga No. 75831, 2000 Ohio App. LEXIS 338 (Feb. 3, 2000).

{¶ 71} The "best interest determination" focuses on the child, not the parent. R.C. 2151.414(C); *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994). The discretion that the juvenile court enjoys in deciding whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned. *Id.* at 316.

{¶ 72} The trial court determined that awarding permanent custody to the agency is in A.M.'s best interest under R.C. 2151.414(D)(1) and cited the underlying factors:

> The Court further finds that, in accordance with Division (D)(1) of R.C. 2151.414, Permanent Custody is in the child's best interest: The interaction and interrelationship of the child with the parents, siblings, relatives and foster parents; the wishes of the child (the child is too young to express wishes); the custodial history of the child, including whether the child has been in temporary Custody of a public child services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of Permanent Custody, and whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. These factors weigh in favor of Permanent Custody.

Journal entry No. 091299158 (Mar. 6, 2019), p. 2.

**{¶ 73}** As this court has previously recognized on the question of manifest weight of the evidence, a "claim that a factual finding is against the manifest weight of the evidence requires us to examine the evidence and determine whether the trier of fact clearly lost its way." *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 44, citing *In re M.W.*, 8th Dist. Cuyahoga No. 83390, 2005-Ohio-1302.

**{¶ 74}** In reviewing an appeal involving an award of permanent custody,

> "the ultimate question for a reviewing court is whether the trial court's findings are supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43. This is because a juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence." *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

*In re S.C.*, 8th Dist. Cuyahoga No. 108036, 2019-Ohio-3664, ¶ 74.

**{¶ 75}** The trial court reiterated on the record that it would be interested in the results of a meeting between the Father, foster parents, and the agency but stated that it would not order that the meeting occur. Father has not appealed the trial court's final judgment. The trial court also stated on the record several times that the focus is on the child. "I do want to emphasize, because it did make a big impression on me, is [Digney]'s comment about the damage that would happen if this child is reunified and removed a third time." (Tr. 214.)

{¶ 76} The weight of the evidence supporting the permanent placement of A.M. with CCDCFS is clear and convincing. A.M. has been adjudicated a dependent child and the agency has been involved in his life since birth in 2015 to a drug addicted mother. The agency has twice assumed emergency temporary custody of A.M., twice attempted reunification with Mother and has exercised protective supervision. Mother continues to suffer from drug relapses in spite of ongoing mental health and substance abuse counseling services and there are no family members willing or able to assume custody. More than 60 calls to the agency's 696-KIDS emergency hotline have been made regarding children in Mother's household. All of Mother's children have been removed from her care.

{¶ 77} A.M. has been placed with foster parents who love, support, and would like to adopt him. The foster parents are amenable to allowing visitation by A.M.'s biological family members. Notwithstanding Mother's participation in programs to address her drug addiction and documented mental health concerns, she is unable to provide an adequate and suitable home for A.M. The concerns expressed by the social worker, trial court, and GAL about the traumatic emotional impact of removing three-year-old A.M. from the foster parents a third time are well-founded.

{¶ 78} The record contains clear and convincing evidence that the trial court did not abuse its discretion in determining that permanent custody is in the best interest of the child. The trial court's decision to grant permanent custody to CCDCFS is not against the manifest weight of the evidence.

{¶ 79} "The purpose of the termination of parental rights statutes is to make a more stable life for the dependent children and to facilitate adoption to foster permanency for children." *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, *5 (Aug. 1, 1986). We find that the purpose has been fulfilled by the trial court's award.

{¶ 80} The assigned error is without merit.

### III. Conclusion

{¶ 81} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MARY J. BOYLE, P.J., and
LARRY A. JONES, SR., J., CONCUR